**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

KARIM HAKIMYAR, *et al.*,

                Plaintiffs,

       v.

HABIB BANK LIMITED,

                Defendant.

---

Case No. 1:24-cv-00993-LGS-OTW

**ORAL ARGUMENT REQUESTED**

 

**MEMORANDUM IN SUPPORT OF**
**HABIB BANK LIMITED'S MOTION TO DISMISS THE COMPLAINT**

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

June 3, 2024                         *Counsel for Habib Bank Limited*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

THE COMPLAINT'S INSUFFICIENT ALLEGATIONS ..............................................2

ARGUMENT .............................................................................................................7

I.  THE COMPLAINT FAILS TO STATE AN ATA CLAIM AGAINST HBL .........................7

    A.  The Complaint Fails To State A Primary-Liability Claim (Counts 3 & 4).........................8

    B.  The Complaint Fails To State A Secondary-Liability Claim (Counts 1 & 2)....................10

II.  NINE FAMILY-MEMBER PLAINTIFFS LACK STANDING TO SUE UNDER THE
    ANTITERRORISM ACT ..........................................................................................22

III. THE COURT LACKS PERSONAL JURISDICTION OVER HBL ....................................23

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)...............................................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................8, 22

*Bank of Am. Corp v. City of Miami*,
   581 U.S. 189 (2017).........................................................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................................8

*Brown v. Nat'l Bank of Pakistan*,
   No. 19-cv-11876, 2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022) .........................23, 24, 25, 26

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
   274 F. Supp. 2d 86 (D.D.C. 2003)...................................................................................10

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)..............................................................................................27

*Daou v. BLC Bank, S.A.L.*,
   42 F.4th 120 (2d Cir. 2022) ............................................................................................25

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*,
   No. 19-cv-05394-BMC, 2023 WL 4850999 (E.D.N.Y. July 28, 2023) .................................25

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021).........................................................................................................25

*Freeman v. HSBC Holdings PLC*,
   465 F. Supp. 3d 220 (E.D.N.Y. 2020) .............................................................................20

*Freeman v. HSBC Holdings, PLC*,
   57 F.4th 66 (2d Cir. 2023) .................................................................................1, 11, 22, 23

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ..............................................................................................21

*Halberstam v. Welch*,
   705 F.2d 477 (D.C. Cir. 1983) .........................................................................................12

*Honickman v. BLOM Bank SAL*,
　6 F.4th 487 (2d Cir. 2021) ............................................................ *passim*

*In re S. Afr. Apartheid Litig.*,
　15 F. Supp. 3d 454 (S.D.N.Y. 2014)..................................................14

*In re Terrorist Attacks on September 11, 2001*,
　538 F.3d 71 (2d Cir. 2008)................................................................26

*Jesner v. Arab Bank, PLC*,
　584 U.S. 241 (2018)...........................................................................24

*Kaplan v. Lebanese Canadian Bank, SAL*,
　999 F.3d 842 (2d Cir. 2021)..............................................................14

*Kemper v. Deutsche Bank AG*,
　911 F.3d 383 (7th Cir. 2018) ............................................................12

*Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*,
　530 F. Supp. 3d 8 (D.D.C. 2021) ......................................................21

*King v. Habib Bank Limited*,
　No. 20-cv-04322, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ............11

*King v. Habib Bank Ltd.*,
　No. 20-cv-04322, 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ...................1, 8, 24

*Lerner v. Fleet Bank, N.A.*,
　318 F.3d 113 (2d Cir. 2003)..............................................................10

*Licci v. Lebanese Canadian Bank*,
　732 F.3d 161 (2d Cir. 2013)..........................................................24, 25

*Linde v. Arab Bank, PLC*,
　882 F.3d 314 (2d Cir. 2018)..........................................9, 10, 14, 18

*Miller v. Arab Bank, PLC*,
　372 F. Supp. 3d 33 (E.D.N.Y. 2019) ................................................24

*Nye & Nissen v. United States*,
　336 U.S. 613 (1949).....................................................14, 15, 17

*O'Neill v. Al Rajhi Bank*,
　714 F.3d 118 (2d Cir. 2013).........................................9, 10, 26

*O'Sullivan v. Deutsche Bank AG*,
　No. 17-cv-8709, 2020 WL 906153 (S.D.N.Y. Feb. 25, 2020) ...............20

*Paroline v. United States*,
    572 U.S. 434 (2014)................................................................................10

*Rothstein v. UBS*,
    708 F.3d 82 (2d Cir. 2013)...........................................................9, 10, 11

*Siegel v. HSBC North America Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)...............................................................16, 20

*SPV OSUS, Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..................................................................12

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)........................................................................ *passim*

*Walden v. Fiore*,
    571 U.S. 277 (2014)..............................................................................26

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016)..................................................................25

*Weiss v. National Westminster Bank, PLC*,
    993 F.3d 144 (2d Cir. 2021)................................................................9, 19

*Zobay v. MTN Group Ltd.*,
    No. 21-cv-3503, 2023 WL 6304961 (E.D.N.Y. Sep. 28, 2023) .....................15, 23

## STATUTES AND RULES

18 U.S.C. § 2331.................................................................................... *passim*

18 U.S.C. § 2333.........................................................................................9

Fed. R. Civ. P. 8.........................................................................................8

Fed. R. Civ. P. 12(b)(6)...............................................................................7

N.Y. C.P.L.R. § 302(a)(1)............................................................................25

## OTHER AUTHORITIES

NYDFS and FRBNY 2015 Consent Order,
    https://www.dfs.ny.gov/system/files/documents/2020/04/ea151215_habib.p .......................6

NYDFS Notice of Hearing and Statement of Charges,
    https://www.dfs.ny.gov/system/files/documents/2020/03 /ea170824 ......................5

Sanctions, United Nations,
    https://www.un.org/securitycouncil/sanctions/information;......................................3

## PRELIMINARY STATEMENT

Defendant Habib Bank Limited (HBL) unequivocally condemns the attacks in Afghanistan between 2014 and 2017 and expresses profound sympathy to the victims and their family members. HBL categorically denies, however, any involvement in or support for those attacks. HBL has appeared voluntarily, without being served, to clear its name of these outrageous accusations.

Plaintiffs' Complaint purports to plead Antiterrorism Act ("ATA") primary- and secondary-liability claims. The allegations are copied verbatim from the complaints filed in *King v. Habib Bank Limited*, No. 1:20-cv-04322-LGS-OTW (S.D.N.Y. June 5, 2020), and the cases consolidated therewith, *Alexander v. Habib Bank Limited*, No. 1:21-cv-02351-LGS-OTW (S.D.N.Y. Mar. 17, 2021), and *Border v. Habib Bank Limited*, No. 1:21-cv-06044-LGS-OTW (S.D.N.Y. July 14, 2021). This Court dismissed the identical primary-liability claims in those cases for failure to state a claim. *See King v. Habib Bank Ltd.*, No. 20-cv-04322, 2022 WL 4537849 (Sept. 28, 2022). Plaintiffs' primary-liability claims here fail for the same reasons.

Although this Court allowed secondary-liability claims to proceed in *King*, the Supreme Court thereafter handed down *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the stringent standard to plead aiding-and-abetting liability and cast doubt on certain ATA precedent. The Second Circuit in *Freeman v. HSBC Holdings, PLC*, 57 F.4th 66 (2d Cir. 2023), also clarified the requirements to plead ATA conspiracy liability. While this Court declined to reconsider its secondary-liability ruling in *King* following *Twitter* and *Freeman*, the Court may now consider those controlling decisions outside the narrow standard for reconsideration. Applying these new precedents without constraint, dismissal of the secondary-liability claims plainly is warranted.

The claims of nine Plaintiffs must be dismissed for the independent reason that these Plaintiffs lack standing. Those Plaintiffs have relatives who survived attacks in Afghanistan and are neither "survivors" nor "heirs" authorized to bring ATA claims under 18 U.S.C. § 2333(a).

Finally, Plaintiffs fail to plead facts to support personal jurisdiction over HBL in this case. HBL acknowledges that the Court previously held these allegations sufficient to establish personal jurisdiction in *King*, but respectfully renews its arguments for dismissal on this basis.

## THE COMPLAINT'S INSUFFICIENT ALLEGATIONS

The Complaint's rhetoric is alarming but its well-pled factual allegations concerning HBL are sparse. Stripped of rank speculation and conclusory assertions, these allegations boil down to nine individuals and entities that, Plaintiffs contend, had connections to a nebulous "Syndicate" of terror groups. According to the Complaint, these nine individuals and entities engaged in some banking activity with HBL, the largest bank in Pakistan that serves more than 35 million customers worldwide. The Complaint does not connect *any* HBL accounts or *any* transaction through HBL to any of the terrorist attacks that injured Plaintiffs. Nor does the Complaint allege that HBL was aware of the alleged accountholders' terrorist affiliations when it allegedly provided them banking services, much less that HBL *intended* to perpetrate any terrorist attack or conspire with any individual or entity to do so. And the only customer on whose behalf the Complaint alleges HBL processed U.S. transactions is Al Rajhi Bank — another large commercial bank with whom HBL's New York branch maintained a correspondent banking relationship from 2014 to 2017.

**Hafiz Muhammad Saeed and Zafar Iqbal** (Compl. ¶¶ 4, 76-77, 161, 218, 269). The Complaint alleges that Hafiz Muhammad Saeed and Zafar Iqbal, allegedly co-founders of Lashkar-e-Taiba, maintained accounts with HBL at unspecified points in time, but makes no allegation about how the accounts were used, what currency funds were held in, when the accounts were open, or when HBL may have learned of Saeed and Iqbal's terrorist connections.

**Jalaluddin Haqqani** (Compl. ¶¶ 4, 53, 56, 60, 66-68, 72, 161, 218). The Complaint alleges (at ¶ 161) that Jalaluddin Haqqani "advertised his account at HBL as a destination for donations *in the 1990s*" (emphasis added), but makes no allegation that HBL *ever* processed *a*

*single transaction* through this account, much less at a time remotely proximate to the attacks between 2014 and 2017.  The Complaint muddies the water with allegations about Jalaluddin's son, Sirajuddin (*see, e.g., id.* ¶¶ 333, 343), but does not allege that Sirajuddin ever used any HBL services, or that he ever conducted any transactions through his father's account.

**Al Rashid Trust / Al Akhtar Trust** (Compl. ¶¶ 4, 162-67, 218-20, 230-31).   The Complaint alleges (at ¶¶ 162-67, 167, 220) that HBL maintained accounts for alleged "al-Qaeda front" Al Rashid Trust (designated in 2001 by the United States as a SDGT) and its successor Al Akhtar Trust (designated in 2003).  The Complaint does not allege that HBL allowed either entity to execute a post-designation transaction or otherwise act with awareness of this entity's terrorist aims.  Instead, the allegations suggest that at some point, Al Rashid / Al Akhtar began using an alias with HBL.  *Id.* ¶¶ 167, 220.  The Complaint initially asserts that HBL "un-froze" Al Rashid accounts that "the United Nations had ordered . . . frozen" and then allowed the alias to use them, but Plaintiffs do not allege how an alias could use accounts belonging to another customer.  *Id.* ¶ 167.  Besides, the United Nations does not issue "order[s]," much less to private banks.  *See generally* U.N. Charter art. 41 ("The Security Council may . . . call upon the Members of the United Nations to apply [sanctions] measures").  The "un-freezing" allegation in any event is contradicted by the subsequent allegation that sometime after 2001, HBL allowed the alias to open new accounts in its own name.  *Id.* ¶ 220.  But the Complaint alleges no facts plausibly suggesting that HBL knew Al Rashid was using this alias until at least 2008, when the U.S. Department of the Treasury first identified it, and the Complaint makes clear that HBL also froze any Al Rashid / Al Akhtar account in 2008.  *Id.* ¶ 167.

**Al Rehmat Trust**.  (Compl. ¶¶ 4, 114-120, 168, 218-19).  The Complaint tries but fails to adequately allege (at ¶¶ 115, 118, 168) that Al Rehmat Trust ("ART"), an alleged "front" for FTO

Jaish-e-Mohammed, had some type of "banking relationship" with HBL at an unspecified time. Plaintiffs concede (at ¶ 219) that this account was not opened in ART's name. Rather, it was held "in the name of" an individual, Ghulam Murtaza, who has never been designated (*id.* at ¶ 119), a point confirmed by the article cited in the Complaint (*id.* at ¶ 118 n.97). And while the Complaint alleges (at ¶ 219) that ART "collected substantial sums in cash and deposited those funds to HBL accounts," it includes no facts about the timing, currency, or purpose of those supposed funds.

**Dawood Ibrahim & D-Company** (Compl. ¶¶ 4, 184-92, 218, 221, 269). The Complaint makes no allegation that Dawood Ibrahim, an alleged drug trafficker, or his alleged "al-Qaeda aligned drug empire," D-Company, held accounts at HBL. The Complaint instead asserts the legal conclusion that HBL helped Ibrahim and D-Company "launder drug money profits." *Id.* ¶ 184. The only alleged facts connecting Ibrahim, D-Company, and HBL are that a son of "former HBL Senior Vice President, Javed Miandad" married Ibrahim's daughter, that Miandad provided unspecified "banking channels" to Ibrahim in the 1990s, and that D-Company invested through shell companies in an HBL subsidiary. *Id.* ¶ 190. There are no factual allegations connecting Ibrahim to HBL after Ibrahim's designation as a SDGT in 2003, only the baseless speculation that it is "*highly likely*" that some transactions identified in a 2017 regulatory investigation of HBL's New York branch ("HBLNY") involved Ibrahim or D-Company (*id.* ¶ 191).

**Osama bin Laden** (Compl. ¶¶ 4, 161, 218). The Complaint alleges (at ¶ 161) that Osama bin Laden held an account with HBL and that this purported account "was frozen . . . in 2003," precluding any inference that bin Laden (or anyone else) used this account to facilitate the attacks that injured Plaintiffs, because HBL blocked the account from being used *eleven years* before the first attack. There also are no allegations about any transactions in the account before it was frozen.

**Pakistan's Inter-Services Intelligence ("ISI")** (Compl. ¶¶ 7, 80-81, 120, 169-83, 186-87,

218, 223, 230-31, 269-71, 283). The Complaint asserts the characterization that HBL was "the unofficial bank of the Pakistani ISI" (*id.* ¶ 169), a Pakistani intelligence agency, but does not allege that ISI held an account at HBL. Instead, Plaintiffs allege (at ¶¶ 176-78) that three ISI operations — the latest of which occurred in 2004, *ten years* before the first attack — somehow used HBL's banking services. But Plaintiffs do not allege *that any* of those operations involved any group alleged to be a member of the "Syndicate," or that they involved any injuries to Americans in Afghanistan. Nor do Plaintiffs allege *facts* that ISI used *any* of HBL's services after 2004.

**Al Rajhi Bank** (Compl. ¶¶ 133-35, 222). The allegations about Al Rajhi Bank ("ARB") misleadingly embellish the 2017 Notice of Hearing and Statement of Charges brought by the New York Department of Financial Services ("NYDFS") against HBLNY for "compliance failures" — not unlawful transactions. *Id.* ¶¶ 134-36; *see* NYDFS Notice of Hearing and Statement of Charges, https://www.dfs.ny.gov/system/files/documents/2020/03 /ea170824_habib_notice.pdf ("Notice") (cited in Compl. ¶ 132 n.107). The Complaint alleges (at ¶¶ 133-35) that "NYDFS . . . found evidence that HBL deliberately avoided obtaining information" about the use of ARB's correspondent account and "ensured that Al Rajhi Bank and its customers could continue to support terrorism undetected." This is false as evident in the Notice itself and the Court should disregard this mischaracterization. In reality, NYDFS alleged that: (1) ARB ran "nested" transactions through HBL on behalf of its affiliates, but "[t]his type of 'nesting' activity was unknown to [HBL] management"; (2) HBL's customer due diligence file "did not include sufficient information" about ARB's customers or its "expected versus actual transaction activity"; and (3) the bi-weekly calls between HBL and ARB did not sufficiently address compliance risks. Notice at 6-7. Although the Notice states that the ARB account presented "a significant *risk* of being used for terrorist financing and money laundering" (Compl. ¶ 134 (emphasis added)), the

NYDFS never alleged much less found that funds traveled through ARB's account to support *any* terror attacks, let alone the attacks that injured Plaintiffs. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.") (cleaned up). The Complaint does not, and cannot, allege that ARB has ever been indicted, ever been the subject of OFAC or other U.S. regulator enforcement action, or ever been designated by the United States or any other government. In fact, ARB repeatedly has prevailed in defeating civil ATA allegations, underscoring the implausibility of Plaintiffs' conclusory allegations involving ARB as a means of stating an ATA claim against HBL.

**Alleged Compliance Failures** (Compl. ¶¶ 5, 6, 8, 10, 128-159, 191, 198, 227, 272). The Complaint makes other general allegations that derive directly from NYDFS's 2017 investigation of HBL's compliance practices as laid out in the Notice. As the Complaint alleges (at ¶ 128), in 2006, HBL entered into a written agreement with the Federal Reserve Board of Governors ("FRBNY") and NYDFS in which HBL committed to addressing deficiencies relating to HBLNY's AML program. In 2015, HBL entered a consent order with NYDFS and FRBNY because HBLNY had not "achieved full compliance with each and every provision" of the 2006 agreement — not because HBL and its New York branch flouted the agreement, as Plaintiffs incorrectly suggest (at ¶ 130). *See* NYDFS and FRBNY 2015 Consent Order at 2, https://www.dfs.ny.gov/system/files/documents/2020/04/ea151215_habib.pdf) (cited at Compl. ¶ 130 n.106). The subsequent 2017 Notice alleged civil violations of New York banking laws for compliance shortcomings — *not for processing transactions in support of terrorism*.

Despite the Complaint's mischaracterizations, *none* of these regulatory actions accused HBL of processing *any* transaction on behalf of a designated individual or terrorist supporter. The

Complaint cites (at ¶¶ 137-145) the Notice's reference to HBL's whitelist, a common screening tool, but the Notice *did not* allege that HBL's whitelist was "designed to facilitate terror financing" or used to "facilitate at least several million dollars of financial transactions" on behalf of terrorists. Plaintiffs accuse HBL (at ¶ 147-159) of "intentionally engag[ing] in 'wire-stripping' to obscure the terrorist affiliations" of its customers, but this allegation also has no support in the Notice. NYDFS faulted HBL for failing to further investigate *two instances* in which HBL received "instructions" *from its customers* "to withhold the name of a transaction's beneficiary."  Notice ¶¶ 22-24.   The Complaint also alleges (at ¶¶ 151-152) that HBL "adopt[ed] a policy of affirmatively choosing not to report" suspicious transactions, apparently relying on NYDFS's detection of about 200 "instances of suspicious activity that *were never identified* or reported" (emphasis added).   *See* Notice ¶ 28.   This allegation is nonsensical: HBL could not have "affirmatively cho[sen]" to conceal suspicious activity that the Bank had "never identified."  These regulatory investigations did not find — and cannot support an inference that — HBL supported or conspired to engage in terrorism, much less the attacks that injured Plaintiffs.

## ARGUMENT

## I.   THE COMPLAINT FAILS TO STATE AN ATA CLAIM AGAINST HBL

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555-56.   The Court must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678 (citation omitted).

Deconstructing the 538-paragraph Complaint reveals that it is full of inflammatory rhetoric and unsupported characterizations of HBL's conduct and knowledge but lacks "well-pleaded facts" to support Plaintiffs' ATA claims.

### A.    The Complaint Fails To State A Primary-Liability Claim (Counts 3 & 4)

This Court already has dismissed identical primary-liability claims for failure to state a claim in *King*.  2022 WL 4537849, at *4.  Plaintiffs' primary-liability claims likewise fail.

ATA primary liability requires (1) that the defendant perpetrated an act of international terrorism, and (2) the defendant's acts caused the plaintiff's injuries.  *See* 18 U.S.C. § 2333(a); *see also King*, 2022 WL 4537849, at *4.  The Complaint fails to allege facts sufficient to meet either requirement.

### 1.    The Complaint Fails To Allege Facts To Support A Plausible Inference That HBL Committed An Act of International Terrorism

To plausibly allege that HBL's actions were, themselves, "acts of international terrorism," Plaintiffs must allege that HBL's "*own* actions involved violence or danger and appeared intended to intimidate or coerce civilians or to influence or affect governments."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 328 (2d Cir. 2018) (emphasis added); *see also* 18 U.S.C. § 2331(1) (defining act of international terrorism).

Under controlling Second Circuit law, banking and financial services are not, themselves, "dangerous to human life" and do not constitute acts of international terrorism.  *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 497 (2d Cir. 2021) (holding that even "'knowingly providing' material support to [terrorists] in the form of 'financial services'" does not constitute an "act of international terrorism"); *Weiss v. National Westminster Bank, PLC*, 993 F.3d 144, 162-63 (2d Cir. 2021) (holding that the provision of banking services does not constitute an "act of international terrorism").  The Complaint alleges at most that HBL provided general banking

services and processed payments to customers allegedly affiliated with a so-called "Syndicate." *See* Compl. ¶¶ 3, 4, 161.  Plaintiffs thus fail to allege that HBL committed an act of international terrorism, and so fail to state a claim for primary liability.

### 2. The Complaint Fails to Allege Facts Supporting A Plausible Inference That HBL Proximately Caused Plaintiffs' Injuries

Plaintiffs' primary-liability claims should be dismissed for the independent reason that the Complaint does not allege facts supporting a plausible inference that HBL conduct proximately caused Plaintiffs' injuries.  The Second Circuit has held that the "by reason of" language in Section 2333(a) requires that the defendant's conduct proximately caused the plaintiff's injuries.  *Rothstein v. UBS*, 708 F.3d 82, 95 (2d Cir. 2013); *see also O'Neill v. Al Rajhi Bank*, 714 F.3d 118, 123 ("*Terrorist Attacks VII*") (2d Cir. 2013) ("Congress did not 'intend[] to permit recovery under § 2333 on a showing of less than proximate cause.'") (quoting *Rothstein*, 708 F.3d at 95).

In evaluating proximate cause in an ATA case, "the central question is whether the alleged violation led directly to the plaintiffs' injuries."  *Rothstein*, 708 F.3d at 91-92; *see also Paroline v. United States*, 572 U.S. 434, 444 (2014) (holding proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged") (citation omitted).  The defendant's purported conduct must also be a "*substantial factor in the sequence of responsible causation*."  *Rothstein*, 708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).  And while a plaintiff's injuries must be "reasonably foreseeable or anticipated as a natural consequence," *id.*, "foreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp v. City of Miami*, 581 U.S. 189, 201 (2017).

Here, Plaintiffs cannot plead proximate causation based on allegations (at ¶¶ 4-7) that HBL afforded routine, arm's-length "banking services" to individuals and entities with supposed links to the "Syndicate," and failed to identify and stop suspicious transactions that Plaintiffs baselessly

speculate were connected to terrorism. As the Second Circuit repeatedly has explained, mere provision of routine banking services "to organizations and individuals said to be affiliated with [a terror group]" cannot establish proximate cause for injuries arising from subsequent terror attacks. *See Terrorist Attacks VII*, 714 F.3d at 124 (rejecting allegation that banking services provided to "organizations and individuals said to be affiliated with al Qaeda" could have "proximately caused the September 11, 2001 attacks or plaintiffs' injuries") (quoting *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003)); *see also Linde*, 882 F.3d at 327 ("[T]he mere provision of 'routine banking services to organizations and individuals said to be affiliated with' terrorists does not necessarily establish causation.").

The Complaint "does not allege that [HBL] was a participant in the terrorist attacks that injured plaintiffs." *Rothstein*, 708 F.3d at 97. And the Complaint makes no factual allegations tracing any transactions through HBL to any of the groups that allegedly perpetrated those attacks. Even Plaintiffs' allegation (at ¶ 72) that in "the 1990s, Jalaluddin Haqqani advertised an HBL account as a destination for donations to the [Haqqani Network] in his magazine," misses the mark because the Complaint does not allege that any donations were actually sent to Jalaluddin's alleged HBL account, nor does it allege how funds in this account were used, much less that they were used to support these attacks decades later.

## B.    The Complaint Fails To State A Secondary-Liability Claim (Counts 1 & 2)

After this Court upheld the allegations in *King* as plausibly stating secondary-liability claims, the controlling law on ATA secondary liability changed profoundly through *Twitter* and *Freeman*. While this Court declined to reconsider its ruling in *King*, citing the "strict" standard on a motion for reconsideration, *King v. Habib Bank Limited*, No. 20-cv-04322, 2023 WL 8355359, at *1 (S.D.N.Y. Dec. 1, 2023), that strict standard does not apply on a motion to dismiss. HBL respectfully submits that Plaintiffs' allegations, considered afresh, are insufficient to state

the requisite elements of aiding-and-abetting claims under *Twitter* or conspiracy claims under

*Freeman*.

### 1.    The Complaint Fails To Allege Facts Supporting A Plausible Inference that HBL Aided and Abetted Al Qaeda Or Another FTO

To state an ATA aiding-and-abetting claim under § 2333(d)(2), a plaintiff must allege that

the defendant "aids and abets, by knowingly providing substantial assistance [to]" "the person who

committed the terrorist act." *Linde*, 882 F.3d at 320 (alteration in original) (citing 18 U.S.C.

§ 2333(d)(2)). In addition, "the defendant must be generally aware of his role as part of an overall

illegal or tortious activity at the time that he provides the assistance." *Twitter*, 598 U.S. at 486

(quoting *Halberstam v. Welch*, 705 F.2d 477, 487-88 (D.C. Cir. 1983)). The plaintiff must also

allege injuries arising from an act of international terrorism "committed, planed, or authorized" by

a designated FTO. 18 U.S.C. § 2333(d)(2). Finally, a plaintiff must allege that the defendant's

actions proximately caused the plaintiff's injuries. The Complaint fails to allege facts sufficient

to establish any of these elements.

### a.    *Twitter* Announced A More Stringent Standard To Plead Knowing And Substantial Assistance

In *Twitter*, the Supreme Court held that to survive dismissal on the "knowing and

substantial assistance" prong, a plaintiff must surpass a higher pleading threshold than the Second

Circuit previously required. 598 U.S. at 497. *Twitter* unanimously rejected ATA

aiding-and-abetting claims based on defendants allegedly profiting from and failing to stop ISIS's

use of their social-media platforms to fundraise, recruit terrorists, and spread propaganda. *Id.* at

497-98. The Court held that the plaintiffs there failed to plead "knowing and substantial

assistance" because they did not allege facts supporting the conclusion that the defendants

"*consciously and culpably participated in* the" terrorist attack at issue. *Id.* at 506 (emphasis

added). *Twitter* repudiated multiple components of the Second Circuit's previously articulated

framework for ATA aiding-and-abetting liability.

*First*, *Twitter* held that "the text [of the ATA] *requires* that defendants have aided and abetted *the act of international terrorism that injured the plaintiffs*," and that allegations of "substantial assistance *to a transcendent 'enterprise*,' separate from and floating above all the actionable wrongs that constitute it" are "not enough." *Id.* at 497 (emphasis added). The Supreme Court directed courts to "focus" on the injury-causing attacks and to consider the "nexus" between a defendant's alleged assistance and those attacks. *Id.* at 503. Before *Twitter*, "knowing and substantial assistance to the actual injury-causing act . . . [was] unnecessary" under Second Circuit law. *Honickman*, 6 F.4th at 499; *see also* Br. for the United States as Amicus Curiae 13-14, *AstraZenica UK Ltd. v. Atchley*, No. 23-9 (U.S. May 21, 2024) (explaining that *Twitter* held courts of appeals had erred in focusing on alleged assistance to FTOs "in general, rather than the terrorist attacks that injured [plaintiffs]").

*Second*, the Supreme Court held that the "knowing and substantial assistance" component of aiding-and-abetting liability is "designed to capture the defendants' state of mind with respect to their actions and the tortious conduct." *Twitter*, 598 U.S. at 504 (internal citations omitted). The Court faulted the Ninth Circuit for analyzing the "knowing" prong "as a carbon copy" of the general awareness prong. *Id.* at 503. Yet the Second Circuit historically has done precisely that. *See Honickman*, 6 F.4th at 500 (holding that when assistance is provided knowingly, the defendant is not required "to 'know' anything more about [the principal's] unlawful activities than what [it] knew for the general awareness element"); *see also* Br. for the United States as Amicus Curiae 15-16, *AstraZenica UK Ltd. v. Atchley*, No. 23-9 (U.S. May 21, 2024) (explaining that *Twitter* means the Second Circuit erred in *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842, 846 (2d Cir. 2021) in conflating "knowing" and "general assistance" prongs).

**Third**, the Supreme Court expressly incorporated the criminal-law standard for aiding-and-abetting liability, which "requires 'that a defendant in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed' before he could be held liable." *Twitter*, 598 U.S. at 490 (quoting the criminal case of *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)); *see also id.* at 493. *Twitter* explained that this conscious culpability requirement is "necessary to justify punishment of a secondary actor, lest *mostly passive actors like banks* become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491 (emphasis added). Yet in *Kaplan* and *Linde*, the Second Circuit explicitly rejected the argument that an ATA defendant must intend to further terrorist activity, and rejected the criminal aiding-and-abetting standard in particular. *See Kaplan*, 999 F.3d at 858-861 (declining to require "defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed'" (quoting *Linde*, 882 F.3d at 329-30)).

The Second Circuit has not yet applied *Twitter* in an ATA aiding-and-abetting case, but a decision currently is pending in *Wildman v. Deutsche Bank Aktiengellschaft*, 23-132 (2d Cir. argued Mar. 13, 2024), where *Twitter* may be applied. Even without the Second Circuit's application of *Twitter*, however, this Court is bound to apply the Supreme Court's standard. *See In re S. Afr. Apartheid Litig.*, 15 F. Supp. 3d 454, 459-60 (S.D.N.Y. 2014) (applying Supreme Court precedent that "directly undermine[s] the central holding" of prior Second Circuit precedent). Following *Twitter*, allegations of mere assistance to a terror group do not suffice to state an ATA claim when not accompanied by allegations that the defendant "consciously tr[ied] to help or otherwise 'participate in'" the relevant attacks. *Zobay v. MTN Group Ltd.*, No. 21-cv-3503, 2023 WL 6304961 at *33-34 (E.D.N.Y. Sep. 28, 2023) (dismissing ATA

aiding-and-abetting claims).

> **b.** **The Complaint Does Not Allege Facts To Support A Plausible Inference That HBL Provided Knowing And Substantial Assistance To The Attacks That Caused Plaintiffs' Injuries**

The Complaint's factual allegations do not support a plausible inference that HBL "consciously and culpably 'participate[d] in'" the specific acts of international terrorism that injured Plaintiffs. *Twitter*, 598 U.S. at 497 (quoting *Nye & Nissen*, 336 U.S. at 619). There are no allegations that any HBL services to any of the nine alleged individuals and entities were used in furtherance of the relevant attacks — or any terrorist attacks, for that matter. Instead, the Complaint alleges generally that HBL conducted routine banking services on behalf of these individuals and entities, with no detail as to how these services and account funds were used.

For certain individuals and entities — Hafiz Saeed, Zafar Iqbal, Al Rehmat Trust, Jalaluddin Haqqani, and Osama bin Laden — Plaintiffs fail to allege that HBL processed *any* transactions, and therefore fail to support a plausible inference that HBL provided "knowing and substantial assistance" to those alleged accountholders. Allegations that HBL's banking services were used by individuals and entities *not* alleged to be customers — the Pakistani ISI, Dawood Ibrahim, and D-Company — also cannot support a plausible inference that HBL acted culpably to "associate itself" with those customers' misdeeds.

As to Jalaluddin Haqqani, Dawood Ibrahim, and Osama bin Laden, any provision of banking services necessarily lacks the requisite nexus to Plaintiffs' injuries in attacks that began in 2014, where HBL is accused of providing banking services to Jalaluddin and Dawood Ibrahim "in the 1990s" and dutifully froze bin Laden's account by at least 2003. *Id.* ¶ 161; *see Twitter*, 598 U.S. at 500 (citing "the distance between defendants' acts . . . and the . . . attack" in concluding plaintiffs failed to establish the requisite nexus to their injuries). HBL also could not have acted consciously or culpably in allegedly opening an account used by Al Rehmat Trust when Plaintiffs'

allegations make clear that any such account was held by an individual named Ghulam Murtaza — an exceedingly common name in Pakistan — who has never been designated and appears on no published list. *See* Compl. ¶¶ 119, 168.

Although the Complaint includes a bold accusation (at ¶ 167) that HBL "unfroze" an account for Al Rashid Trust after that group was designated, there are no well-pled facts to support that allegation and the Court should not credit it, particularly where the Complaint's other allegations directly contradict it, *see id.* ¶ 220. Even were the Court to credit such allegation, there are no non-conclusory allegations of conscious, culpable intent. While the Complaint faults HBL for being slow in freezing Al Rashid's alias's account after the alias was identified, the Complaint's source (¶ 167 n.138) shows that the alleged delay was caused not by HBL but by the regulatory process. This falls far short of alleging that HBL knowingly helped members of the "Syndicate" perpetrate the attacks that injured Plaintiffs.

As for ARB, under *Siegel v. HSBC North America Holdings, Inc.*, it is settled law that alleging mere provision of banking services to ARB cannot alone state an aiding-and-abetting claim under the ATA. 933 F.3d 217, 223, 225 (2d Cir. 2019) (affirming dismissal of ATA aiding-and-abetting claims against HSBC based on allegations of banking ARB). In *Siegel*, the plaintiffs alleged that "HSBC had provided banking services to ARB for more than twenty-five years" and "helped ARB violate banking regulations despite knowing that ARB supported terrorist organizations." *Id.* The Second Circuit held that these allegations were inadequate to plead the knowing-and-substantial-assistance prong, because there were no non-conclusory allegations "that most, or even many, of [a defendant's] services to ARB assisted terrorism," and because "ARB is a large bank with vast operations." *Id.* Plaintiffs here allege even less, offering only the conclusory assertion (at ¶ 134) that HBL's relationship with ARB presented a "risk" of terror financing. This

is plainly insufficient under *Siegel*.

The alleged compliance failures suggest, at most, that HBL failed to identify and prevent the processing of suspicious transactions.  Compl. ¶¶ 142, 152.  But as the Supreme Court explained in *Twitter*, ATA claims that rest "on an alleged failure to stop [terrorists] from using [the defendant's services]" can *only* advance past the pleading stage when there is "a strong showing of assistance and scienter."  *Twitter*, 598 U.S. at 500.  Here, Plaintiffs fail to allege any specific assistance — just general account services — and make no factual allegation whatsoever of HBL's "scienter" in respect of the attacks.  Moreover, the NYDFS Notice did not find, and the Complaint does not allege, that any purported compliance failure led to the processing of *any* transaction on behalf of *any* member of the so-called Syndicate.  The NYDFS Notice alleged that HBL's services *could be* exploited for terrorist purposes, not that any service *had been* exploited.

All told, the Complaint includes no well-pled factual allegation that HBL in any way "culpably 'associated [itself] with'" the attacks at issue, "'participated in [them] as something that [it] wished to bring about,' or 'sought by [its] action to make [them] succeed.'"  *Twitter*, 598 U.S. at 498 (quoting *Nye & Nissen*, 336 U.S. at 619).

### c.    The Complaint Does Not Allege Facts To Support A Plausible Inference That HBL Was Generally Aware Of Its Role In An Overall Illegal Activity

The Complaint also fails to plead even the threshold general awareness element, which requires that a defendant knew "of its role in 'an *overall illegal or tortious activity* at the time that [it] provides the assistance.'"  *Honickman*, 6 F.4th at 496.  Allegations that a defendant merely knew of an "organization's connection to terrorism," without more, do not establish general awareness.  *Linde*, 882 F.3d at 330.  Rather, a complaint must plausibly allege (1) that the defendant "was aware of [its] Customers' connections with [a terror group] *before* the relevant attacks," and (2) that the "Customers were so closely intertwined with [the terror group's] violent

terrorist activities that one can reasonably infer [the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable *while it was providing financial services* to the . . . Customers." *Honickman*, 6 F.4th at 501 (emphasis added).

There are no allegations to support the requisite temporal connection between HBL's alleged awareness of its customers' terrorist connections, its provision of services, and the terrorist attacks at issue. *See id.* (holding defendant must be on notice of customer's ties to terrorism "prior to the relevant attacks" and "at the time that it provided banking services"). The Complaint does not even specify *when* HBL allegedly maintained accounts for Zafar Iqbal, Hafiz Muhammad Saeed, or Al Rehmat Trust, much less when it may have processed transactions through those accounts or learned of their alleged connections to terrorist activities. Compl. ¶¶ 4, 118-19, 161. The assertion that Saeed was "a very public figure in Pakistan," according to a 2012 article, *id.* ¶ 76, is insufficient because this provides no basis to infer HBL would be expected to encounter the 2012 article, or critically, whether HBL continued to provide banking services to Saeed after 2012. *See Honickman*, 6 F.4th at 502 & n.18 (explaining the fact that information was "available" does not necessarily "suggest a defendant's knowledge" if the information was not a matter of "public knowledge" or reported in the mainstream media).

As for Jalaluddin Haqqani and Dawood Ibrahim, Plaintiffs allege only that they received banking services from HBL in the 1990s. Compl. ¶¶ 72, 190. Jalaluddin is not alleged to have been designated by any authority such that HBL might be expected to have been "aware" of regulator views of Jalaluddin, and the sources cited in the Complaint would not have alerted HBL to Jalaluddin's terrorist activities until October 2001, at the earliest. *See* Compl. ¶ 60 n.35. In fact, the sources in the Complaint describe Jalaluddin's collaborations with the United States security establishment throughout the 1980s, and one calls Jalaluddin "a former favourite of the CIA" (¶ 64

–17–

n.40), seriously undermining the suggestion that HBL would know that servicing his account in the 1990s was tantamount to playing a role in an "overall illegal activity." *Honickman*, 6 F.4th at 496. Similarly, the U.S. government did not link Ibrahim to terrorist activity until the next decade, when it designated him in 2003. Compl. ¶ 188. The Complaint otherwise alleges that Ibrahim's earliest terrorist activity "is believed to" have taken place in 1993, but even for that proposition, Plaintiffs cite a report published in 2010. Compl. ¶ 186 n.144.

As to Al Rashid / Al Akhtar Trust and Osama bin Laden, the Complaint specifically alleges (at ¶¶ 161, 167) that HBL froze all accounts affiliated with those customers years before the first attack that injured Plaintiffs, which makes it implausible that HBL had the requisite general awareness in providing services close in time to the attacks. *Siegel*, 993 F.3d at 224 (holding that bank's decision to "not provide banking services" to a customer "for the ten months preceding" the relevant attacks made it "implausible" that the bank "knowingly assumed a role in" the attacks). There also are no well-pleaded factual allegations that HBL provided banking services to the ISI after 2004, which strongly undercuts a finding that HBL "knowingly assumed a role" in attacks that would take place at least ten years later. *See* Compl. ¶¶ 176-78. Moreover, none of the operations for which the ISI allegedly used HBL's services involved any alleged member of the "Syndicate," nor did any involve injuries to Americans in Afghanistan, which also makes it implausible that HBL assumed a role in the specific activities from which the purported Syndicate's attacks against Americans in Afghanistan were foreseeable.

As for ARB, again, the Second Circuit's opinion in *Siegel* forecloses finding general awareness satisfied here based on HBL's provision of routine banking services. *See Siegel*, 933 F.3d at 224 (holding allegations "that HSBC was aware that ARB was believed by some to have links to AQI and other terrorist organizations" did not support an inference that HSBC was

"assuming a role" in a terrorist organization's "violent activities").  General allegations that HBL provided banking services to ARB with insufficient compliance mechanisms are insufficient to plead that HBL was knowingly assuming a role in any of the activities that injured Plaintiffs.

The allegations about HBL's compliance failures fare no better.  NYDFS's finding that HBL's defective whitelist caused two allegedly terror-linked transactions to evade screening does not support that HBL knew any *customer* was "so closely intertwined" with violent activities that by providing banking services it was "playing a role" in terrorist activities, *Honickman*, 6 F.4th at 499, particularly where Plaintiffs do not even allege that the transactions benefitted the purported Syndicate.  *See O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020) (holding "allegations that Defendants knowingly violated laws that were designed principally to prevent terrorist activity" do not establish general awareness); *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020) (same).  Allegations that HBL failed to prevent the processing of transactions with suspicious characteristics similarly cannot suffice.  *Twitter*, 598 U.S. at 481, 498.  Indeed, Plaintiffs concede that, at the time of processing, HBL "never identified"— and thus was not aware of— any indicia of terrorism or other suspicious activity related to these transactions.  Compl. ¶ 152; *see also* Notice ¶ 28.

> **d.    The Complaint Fails To Allege That All Of The Attacks Were Committed, Planned, Or Authorized By A Designated FTO**

The Complaint employs rhetoric and allegations of general support provided by various FTOs to the Taliban (not an FTO), but identifies *no facts* to support a plausible conclusion that any member of an FTO "committed, planned, or authorized" any of the specific attacks.  Merely alleging "general support" by an FTO to the perpetrators of an attack is insufficient.  *See Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*, 530 F. Supp. 3d 8, 13 (D.D.C. 2021) (holding complaint failed to allege attacks were planned or authorized by

Hamas); *see also Gonzalez v. Google LLC*, 2 F.4th 871, 911 (9th Cir. 2021), *rev'd on other grounds*, *Twitter*, 598 U.S. 471 (affirming dismissal because "more is needed in order to plausibly allege a cognizable [secondary liability] claim" than "some connection" between an FTO and the attack) (citing *Twombly*, 550 U.S. at 555). The Complaint strains to bridge a connection between the FTOs and the Taliban by alleging that these entities worked together as a so-called "Syndicate." *E.g.*, Compl. ¶ 21. But the "Syndicate" is a label of Plaintiffs own making, not a designated FTO, nor does the Complaint allege that any government has ever recognized the "Syndicate" in any other capacity. The Complaint also identifies a number of so-called "dual-hatted al-Qaeda/Taliban terrorists." Compl. ¶¶ 333, 345, 347, 349. But the Complaint does not contain any non-conclusory allegations that connect any of these individuals to the attacks that allegedly injured Plaintiffs. Indeed, none of these individuals are identified in the allegations concerning the specific attacks at issue. *See* Compl. ¶¶ 351-504. The Complaint simply states, without supporting facts, that each attack was committed by either "al Qaeda and the Taliban (including its Haqqani Network)," "al Qaeda and the Taliban," or "the Taliban (including its Haqqani Network)." This Court should not credit such conclusory, "threadbare" allegations. *Iqbal*, 556 U.S. at 678.

### e.    The Complaint Fails To Allege Facts Supporting A Plausible Inference Of Proximate Cause

As explained above, the Complaint fails to allege that HBL's conduct proximately caused Plaintiffs' injuries, a requirement that applies equally to secondary-liability ATA claims. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (affirming dismissal of ATA conspiracy claims because the "ATA ultimately is a tort statute," which "means that causation must be proven before liability is established"); *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (explaining that substantial assistance "requires the plaintiff to allege that the actions

of the aider-abettor proximately caused the harm on which the primary liability is predicated"). Dismissal of the secondary-liability claims is required for this reason as well.

> ### 2.    The Complaint Fails To State A Claim For Conspiracy Liability (Count 2)

In *Freeman*, the Second Circuit held that ATA conspiracy liability requires that the defendant and terrorist group were "engaged in a common pursuit" from which a conspiratorial agreement could be inferred, and that the terrorist attacks advanced the object of *that agreement*. 57 F.4th at 80, 82.  It is not enough that a terrorist attack might be a *foreseeable* result of the agreement: civil conspiracy applies only to acts in furtherance of the conspiracy.  *Id*. at 81.  Indeed, the Second Circuit expressly rejected the notion that conspiracy liability could extend to a coconspirator's foreseeable acts *not* in furtherance of the conspiracy: "To hold a defendant liable for a coconspirator's actions merely because they are foreseeable . . . would stretch the concept of civil conspiracy too far beyond its origin."  *Id*. at 82.

Thus, in *Freeman*, the Second Circuit affirmed dismissal of conspiracy claims because the plaintiffs failed to show "how the . . . terrorist attacks furthered the Banks' conspiracy with Iranian entities," where the object of the alleged conspiracy was the same as is alleged here: to "circumvent U.S. sanctions" and provide banking services to terrorists.  *Id*.; *see* Compl. ¶ 292.  The Second Circuit came to this conclusion because, even though plaintiffs alleged that the terrorist attacks at issue were a foreseeable result of those banking services, the plaintiffs had not plausibly alleged that the overt acts — the terrorist attacks at issue — furthered the objectives of the alleged conspiracy to evade U.S. sanctions.  *Freeman*, 57 F.4th at 80-81; *see also Zobay*, 2023 WL 6304961, at *35 (concluding that the conspiratorial agreement must be one "to commit an act of international terrorism") (quoting *Freeman*, 57 F.4th at 75, 80-81).

The Complaint here similarly overreaches.  Putting aside the absence of any well-pleaded

facts supporting any conspiracy or agreement between HBL and any terrorists at all, the Complaint alleges only that HBL conspired to provide banking services, not to commit terrorist attacks. *See* Compl. ¶ 291 ("By agreeing to provide the conspirators with funds and financial services, including illicit access to the U.S. financial system, while knowing that these terrorist organizations would use the resulting funds to pay for terrorist attacks, HBL joined the Syndicate conspiracy."). And without any well-pled factual allegations that the nine alleged customers had publicized or even knowable ties to terrorism *at the time* HBL allegedly provided them with banking services, there similarly is no basis for a plausible inference that HBL's alleged provision of banking services represent HBL's agreement on any underlying unlawful objective. *Freeman* forecloses the conspiracy claim here.

## II. NINE FAMILY-MEMBER PLAINTIFFS LACK STANDING TO SUE UNDER THE ANTITERRORISM ACT

The ATA does not provide an individual with a claim arising from a terrorist attack in which their family members are injured but not killed. *See Brown v. Nat'l Bank of Pakistan*, No. 19-cv-11876, 2022 WL 1155905, at *2 (S.D.N.Y. Apr. 19, 2022) (dismissing for lack of capacity to sue under the ATA claims of family members of individuals injured but not killed). Section 2333(a) authorizes only claims by a "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . . ." 18 U.S.C. §2333(a); *see also Jesner v. Arab Bank, PLC*, 584 U.S. 241, 267 (2018) ("[T]he Anti-Terrorism Act provides a cause of action only to 'national[s] of the United States,' and their 'estate, survivors, or heirs.'") (quoting 18 U.S.C. § 2333(a)). When the person "injured . . . by reason of an act of international terrorism" survives that act, they necessarily have no "survivors" or "heirs" with capacity to sue under the ATA. *See* Black's Law Dictionary (defining "survivor" as "one who outlives another" and heir as "a person who, under the laws of intestacy,

is entitled to receive an intestate decedent's property").  Plaintiffs whose family members survived terrorist attacks thus lack standing to sue as "survivors" or "heirs" under the ATA.  *See Brown*, 2022 WL 1155905, at *2 (dismissing claims brought by plaintiffs whose "family members were injured but not killed in acts of international terrorism"); *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 41 (E.D.N.Y. 2019) ("[U]nder the ATA, someone who survived the attack . . . has no 'survivors' or 'heirs' that can recover for his injuries on his behalf.") (citation omitted).  This Court must therefore dismiss for lack of standing the nine Plaintiffs who bring claims based on attacks that their family members survived.  *See* Compl. ¶¶ 355-57, 401-08.

## III.    THE COURT LACKS PERSONAL JURISDICTION OVER HBL

HBL acknowledges that this Court concluded in *King* that allegations substantially identical to the allegations here "sufficiently allege that the Court has personal jurisdiction over Defendant because Plaintiffs' claims arise out of Defendant's purposeful availment of the privilege of doing business in New York."  *King*, 2022 WL 4537849, at *2.  HBL nonetheless respectfully submits below its arguments in support of dismissal for lack of personal jurisdiction, should the Court be prepared to reassess this issue, and to preserve the argument for appellate review.

To establish jurisdiction under New York's long-arm statute, Plaintiffs must show that their injuries "arise from" HBL's business activity in the state.  *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013) (discussing N.Y. C.P.L.R. § 302(a)(1)).  This requirement demands a "substantial connection" between their injuries and "actual, specific transactions" through HBLNY.  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022).  Similarly, to satisfy Constitutional due process, "the defendants' suit-related conduct must create a substantial connection with the forum state."  *Waldman v. PLO*, 835 F.3d 317, 335 (2d Cir. 2016).  These requirements reflect the "essential foundation of specific jurisdiction" that there be a "strong relationship between the defendant, the forum, and the litigation."  *Ford Motor Co. v. Montana*

*Eighth Jud. Dist. Ct.*, 592 U.S. 351, 353 (2021) (cleaned up).  Merely alleging transactions to institutions with alleged terrorist ties, without showing a substantial relationship between the transfers and the attacks at issue, is "far too tenuous."  *See Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-cv-05394-BMC, 2023 WL 4850999, at *3 (E.D.N.Y. July 28, 2023).

Plaintiffs allege (at ¶¶ 273-74) that HBL used its New York branch to clear "currency exchanges and wire transfers . . . on behalf of terrorist operatives and funders," but the Complaint does not identify *any specific* transactions for *any* customer, not to mention specific U.S. dollar transactions.  Instead, Plaintiffs ask the Court (at ¶¶ 277-282) to infer that, because terror groups allegedly rely on "donations from around the world" in diverse currencies, and commercial banks often use the U.S. dollar as a central exchange currency, such donations "necessarily involved U.S. dollars" because commercial banks often use the U.S. dollar as a central exchange currency, *id.* ¶¶ 278-82.  These general, speculative allegations are deficient under *Licci* and its progeny.  *See Brown*, 2022 WL 1155905, at *3 (holding no prima facie case of personal jurisdiction over Pakistani bank predicated on "generalized allegations and speculations that some funds were transferred through the New York branch based on an assumption that transactions from one currency to another are dollar transactions passing through Federal Reserve Banks in New York").

Plaintiffs' general allegations of transactions processed through New York on behalf of ARB are likewise an insufficient basis for personal jurisdiction.  NYDFS investigated such transactions and *did not conclude that a single one involved terrorism*.  Notice ¶¶ 13, 16.  Plaintiffs thus fail to allege that their injuries "arise out of or relate to" HBL's provision of general commercial banking services to ARB.  *See Brown*, 2022 WL 1155905, at *2 ("[P]laintiff's claims 'must arise out of or relate to the defendant's contact' with the forum." (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).  Plaintiffs' allegations regarding NYDFS's identified compliance

failures do not square that circle.  The alleged compliance failures NYDFS identified primarily concerned HBLNY's failure to adequately screen transactions; NYDFS did not conclude that any such transactions actually furthered terrorism in any form.  Ultimately, NYDFS did not uncover a single transaction processed through the New York Branch that involved a person designated for terrorism links.  Compl. ¶¶ 5, 6, 8, 10, 128-159, 191, 198, 227, 272.

The Complaint alludes vaguely (at ¶¶ 262-271, 289-292) to alternative theories of personal jurisdiction based on conduct expressly aimed at the United States, or conspiracy jurisdiction, but the lack of any concrete allegations to support an inference that HBL intended to support terrorist activity at all defeats those theories.  *See Terrorist Attacks VII*, 714 F.3d at 675, 676 (allegations that defendants "knowingly maintained bank accounts" for individuals associated with terror groups did not suggest that the defendants themselves "'purposefully directed' their 'activities at residents of [this] forum'") (quoting *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 95-96 (2d Cir. 2008)); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in further of the conspiracy would be inconsistent with the 'purposeful availment' requirement.").

Because the Complaint fails to allege that any "suit-related conduct," that is, the processing of transactions linked to terrorism, was in any way connected with HBL's New York Branch, the Complaint should be dismissed for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint with prejudice.  HBL respectfully requests oral argument on its Motion.

Dated:  June 3, 2024
      Washington, DC

Respectfully submitted,

**WHITE & CASE**
*s/ Christopher M. Curran*
Christopher M. Curran
Claire A. DeLelle
Celia A. McLaughlin (*admission pending*)
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:      + 1 202 626 3600
Facsimile:      + 1 202 639 9355
ccurran@whitecase.com
cdelelle@whitecase.com
cmclaughlin@whitecase.com

*Counsel for Habib Bank Limited*