**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KARIM HAKIMYAR, *et al.*,

                Plaintiffs,

    v.

HABIB BANK LIMITED,

                Defendant.

No. 24-cv-993-LGS

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**HABIB BANK LIMITED'S MOTION TO DISMISS**

Ryan R. Sparacino (pro hac vice)
Tejinder Singh (TS0613)
Adam Goldstein (AG0318)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

ARGUMENT ............................................................................................................... 1

    I.    HBL's Motion to Dismiss Plaintiffs' Secondary Liability Claims Fails Under This Court's Prior Decisions in *King* ............................................................................. 1

    II.    The Complaint Pleads Aiding and Abetting ................................................... 6

          A.    Plaintiffs Allege That HBL Consciously, Voluntarily, and Culpably Assisted the al-Qaeda Terror Syndicate's Campaign of Terrorism Against Americans in Afghanistan ......................................................................... 6

          B.    The Complaint States a Claim Under Controlling Precedent .............................. 10

              1.    HBL Misconstrues the Supreme Court's Decision in *Twitter* ...................... 10

              2.    The Complaint Alleges Knowing and Substantial Assistance ..................... 17

              3.    The Complaint Alleges General Awareness ................................................... 19

               4.    Designated FTOs Committed, Planned, and/or Authorized Each Attack in This Case ....................................................................................................... 20

              5.    Proximate Causation Is Not an Element of Secondary Liability ................. 21

    III.    The Complaint Pleads Conspiracy ................................................................. 22

    IV.    The Complaint Pleads Primary Liability ....................................................... 23

    V.    Plaintiffs Have Established a Prima Facie Case of Personal Jurisdiction .......... 23

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
    219 F.3d 519 (6th Cir. 2000) ................................................... 16

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022) ................................................... 4

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017) ................................................... 13

*Bartlett v. Société Générale de Banque Au Liban SAL*,
    2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ........................... 24

*Bonacasa v. Standard Chartered PLC*,
    2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) ............................. 21

*Bonacasa v. Standard Chartered PLC*,
    2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) ......................... 4, 5

*Cabrera v. Islamic Republic of Iran*,
    2024 WL 864092 (D.D.C. Feb. 29, 2024) ................................. 21

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023) ................................................... 1

*Gonzalez v. Justices of Mun. Ct. of Bos.*,
    420 F.3d 5 (1st Cir. 2005) ................................................... 4

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................... 14, 16, 17, 22

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ............................... 10, 13, 19, 21

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ................................................... 19

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013) ................................................... 25

*J.F. v. Adams*,
    2024 WL 1348524 (S.D.N.Y. Mar. 29, 2024) ........................... 3

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ....................... 9, 12, 13, 17, 18, 19, 21

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ............................................................... 22

*King v. Habib Bank Ltd.*,
   2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ........................ 1, 2, 4, 12, 17, 18, 19, 21, 22, 24

*King v. Habib Bank Ltd.*,
   2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ............................ 1, 2, 12, 13, 14, 15, 22

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ............................................................... 24

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ............................................................... 21

*Monsen v. Consol. Dressed Beef Co.*,
   579 F.2d 793 (3d Cir. 1978) ............................................................... 15

*Planned Parenthood S. Atl. v. Kerr*,
   95 F.4th 152 (4th Cir. 2024) ............................................................... 4

*Roth v. Armistice Cap., LLC*,
   2024 WL 1313817 (S.D.N.Y. Mar. 27, 2024) ...................................... 3

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ............................................................... 22

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023) ........................ 1, 5, 11, 12, 13, 14, 15, 17, 18, 19

*United States v. Anderson*,
   747 F.3d 51 (2d Cir. 2014) ............................................................... 17

*United States v. Dupree*,
   2016 WL 10703796 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 767 F. App'x 181 (2d Cir. 2019) ......... 3

*Weiss v. Nat'l Westminster Bank PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ............................................... 24

*Woods v. Barnett Bank of Ft. Lauderdale*,
   765 F.2d 1004 (11th Cir. 1985) ......................................................... 15, 16

*Zobay v. MTN Grp. Ltd.*,
   695 F. Supp. 3d 301 (E.D.N.Y. 2023) ............................................... 5, 6, 21

## Statutes

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................................................. 1

  § 2(a)(6) .......................................................................................................................... 25

  § 2(b) ........................................................................................................................ 10, 21

31 U.S.C. § 5311 *et seq* ...................................................................................................... 12

## Regulations

12 C.F.R. § 211.24(f) ........................................................................................................... 12

12 C.F.R. § 211.24(j) ........................................................................................................... 12

31 C.F.R. Part 103 ................................................................................................................ 12

**ARGUMENT**

This Court should deny Habib Bank Limited's motion to dismiss, which merely repackages arguments this Court already considered and largely rejected in *King v. Habib Bank Ltd.*, 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ("*King I*"), and *King v. Habib Bank Ltd.*, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ("*King II*"). For the reasons given in those decisions, as well as the controlling authorities on which they are based, plaintiffs state valid civil claims against HBL.

**I.    HBL's Motion to Dismiss Plaintiffs' Secondary Liability Claims Fails Under This Court's Prior Decisions in *King*.**

In *King I*, this Court held that the plaintiffs' secondary liability claims against HBL survived under Second Circuit precedent interpreting the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Months after the Supreme Court decided *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), and the Second Circuit decided *Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023), HBL sought reconsideration, arguing that "*Twitter* fundamentally changed the standards to plead the 'knowing and substantial' element of aiding and abetting under the ATA," *King* ECF 160, at 2 (capitalization altered), and that "*Twitter* and *Freeman* require dismissal of the conspiracy claim," *id*. at 10 (capitalization altered). This Court denied that motion in *King II*.

Specifically, this Court held that under *Twitter*, aiding and abetting "refers to a conscious, voluntary, and culpable participation in another's wrongdoing," *i.e.*, "an act of international terrorism." *King II*, 2023 WL 8355359, at *2 (quoting *Twitter*, 598 U.S. at 493, 495). Although HBL argued that *Twitter* effectively overruled the Second Circuit's JASTA precedents by requiring a higher degree of scienter and a stronger nexus between the defendant's assistance and the terrorist attacks, this Court rejected those arguments. The Court explained that HBL had misconstrued *Twitter*, and that the "holdings in *Twitter* largely align with the Second Circuit

1

precedent cited in *King I*." *Id.* The Court further explained that "[f]or a district court to ignore binding Second Circuit precedent, the intervening change in Supreme Court law must so thoroughly undermine pre-existing precedent that it will almost inevitably be overruled by the Second Circuit." *Id.* at *3 (quotation marks omitted). "Because the decision in *Twitter* does not suggest an inevitable overruling by the Second Circuit of its own precedent, *Twitter* does not warrant reconsideration of *King I*'s ruling on the aiding-and-abetting claim." *Id.*

The Court reached the same conclusion vis-à-vis the conspiracy claim, holding that "rather than overturn existing Second Circuit precedent, *Freeman* clarified the law in ways that support *King I*'s holding." *King II*, 2023 WL 8355359, at *4. That is because *Freeman* concluded that a defendant need not conspire directly with terrorists to be liable—thus rejecting an argument HBL had previously made. *Id.* And unlike the complaint in *Freeman*, which merely alleged a conspiracy to evade sanctions against Iran, plaintiffs' complaints in *King* "plead[ed] facts alleging a 'common intent' shared by [HBL] and terrorist organizations such as al-Qaeda: 'driving the U.S. military out of Afghanistan.'" *Id.* (quoting *King I*, 2022 WL 4537849, at *10). This supported a "plausible inference that '[HBL] had an agreement to further its customers' campaign of terrorism and shared a common purpose to do so.'" *Id.* (quoting *King I*, 2022 WL 4537849, at *10).

HBL's current motion to dismiss is no stronger than its failed motion for reconsideration and should be denied for the same reasons. HBL admits that plaintiffs' "substantive allegations are copied verbatim" from *King*. Mem. 1.[1] And HBL's arguments here repackage the ones it made when seeking reconsideration in *King*. Here, as in *King*, HBL relies on the proposition that *Twitter* and *Freeman* overruled the Second Circuit's controlling precedents by requiring a stronger nexus

---

[1] HBL's memorandum of law (ECF 23) is cited as "Mem." Plaintiffs' complaint (ECF 1) is cited using paragraph numbers.

and a greater degree of scienter. *Compare* Mem. 1, 9-12 *with King* ECF 160, at 2. Here, as in *King*, HBL advances a strained reading of *Twitter* at odds with the Supreme Court's holdings. *Compare* Mem. 10-12 *with King* ECF 160, at 2-3. And here, as in *King*, HBL downplays its culpability by construing plaintiffs' allegations in the light least favorable to plaintiffs. *Compare* Mem. 2-8 *with King* ECF 160, at 3-10. This Court's previous decisions accordingly apply: Plaintiffs state claims for aiding-and-abetting and conspiracy under the Second Circuit's controlling precedents (and under *Twitter* and *Freeman*, too); the Second Circuit has not overruled those precedents; and nothing in *Twitter* makes it inevitable that the Second Circuit will do so—which means this Court remains bound by the precedents that dictated its decision in *King*.

In support of the contrary proposition, HBL argues—without citing any authority—that this motion is governed by a different legal standard than its failed motion for reconsideration. But any difference is immaterial. The rule this Court followed in *King II*, requiring it to adhere to Second Circuit precedent unless that precedent will inevitably be overruled, applies in every procedural posture. *See, e.g.*, *J.F. v. Adams*, 2024 WL 1348524, at *6 (S.D.N.Y. Mar. 29, 2024) (applying rule to a motion to dismiss); *Roth v. Armistice Cap., LLC*, 2024 WL 1313817, at *9 (S.D.N.Y. Mar. 27, 2024) (at summary judgment); *United States v. Dupree*, 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 767 F. App'x 181 (2d Cir. 2019) (to a motion to suppress). That is because the rule governs the relationship between district courts and the Second Circuit—and that relationship does not change based on how a motion is styled.

In any event, HBL's motion is functionally a second motion for reconsideration: It rehashes arguments that this Court already rejected (twice) to seek dismissal of allegations that HBL admits are identical to allegations this Court already sustained. If the Court were to grant HBL's motion, HBL would surely then also seek dismissal of the *King* actions, too. This Court accordingly *should*

hold HBL's motion to a high standard and view it with the same skepticism as it would a successive motion to dismiss in *King*.

The only other data point HBL introduces is that the Supreme Court subsequently granted certiorari and then vacated and remanded (GVR) the D.C. Circuit's decision in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), which sustained a different complaint. But "a GVR order is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it." *Gonzalez v. Justices of Mun. Ct. of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005); *see also Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) (collecting cases explaining that "the issuance of a GVR does not speak to the underlying merits of the case"). This Court also did not rely on *Atchley* in *King I* except for a proposition unrelated to the analysis in *Twitter*: whether the attacks were planned or authorized by designated FTOs. *See King I*, 2022 WL 4537849, at *6. Accordingly, the *Atchley* GVR does not suggest that the Second Circuit's JASTA precedents will inevitably be overruled as required for this Court now to disregard them. The same is true of the government's amicus brief recommending a GVR in *Atchley*. That brief is not authority at all— but merely arguments, made in a different circuit, calling for narrow and non-precedential relief. Thus, nothing the government said could justify ignoring Second Circuit precedent.

Courts in this circuit that have considered motions to dismiss secondary liability claims after *Twitter* have ruled in plaintiffs' favor. In *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023), Judge Ramos denied a motion to reconsider the denial of a motion to dismiss a JASTA aiding-and-abetting claim against a bank that provided financial services to a fertilizer company that manufactured explosive materials used in terrorist attacks. The court

explained that "because Plaintiffs allege affirmative misfeasance, rather than merely passive nonfeasance, *Twitter* requires a much less significant showing of scienter and assistance, and it does not require as close a nexus between Standard Chartered's actions and the attacks against Plaintiffs' family members." *Id*. at *10. The court also rejected the argument that the bank "merely provided 'routine services,'" reasoning that some of the services the bank provided required the bank's active participation. *Id*. at *11. The court further held that "Plaintiffs need not allege that Standard Chartered's underlying provision of banking and financial services was, in itself, tortious in order to state a claim." *Id*. In support, the court cited examples provided in *Twitter*, which showed that even non-tortious conduct that gave rise to foreseeable torts could constitute aiding and abetting. *See id*. HBL never mentions *Bonacasa*.

Similarly, in *Zobay v. MTN Group Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023), Judge Amon denied defendant MTN Group's motion to dismiss aiding-and-abetting claims based on allegations that MTN entered a business relationship with known fronts for Iran's Islamic Revolutionary Guard Corps (IRGC) to form Irancell, a telecom joint venture through which it "funneled money and dual-use technologies through the IRGC and Hezbollah to the terrorist groups that perpetrated the Attacks." *Id.* at 314-15. In upholding the aiding-and-abetting claims, the court concluded that plaintiffs "alleged the requisite conscious and culpable participation" demanded by *Twitter*; indeed, the court concluded that plaintiffs' allegations "pleaded a paradigmatic case of a defendant providing 'routine services . . . in an unusual way,' such that the defendant may have acted to aid and abet a 'foreseeable terror attack.'" *Id.* at 346 (quoting *Twitter*, 598 U.S. at 502). The court further held that the plaintiffs "pleaded such 'pervasive and systemic aid' that MTN can be said to have aided and abetted each IRGC-led attack during the period of the alleged assistance." *Id.* at

347 (quoting *Twitter*, 598 U.S. at 502, 506).[2] These persuasive authorities weigh against HBL's motion here.

The easiest path to the correct result is for this Court simply to follow its on-point decisions in *King*. The Court need go no further to deny HBL's motion vis-à-vis the secondary liability claims—but the rest of this brief explains in greater detail why HBL's arguments are wrong.

## II.    The Complaint Pleads Aiding and Abetting

### A.    Plaintiffs Allege That HBL Consciously, Voluntarily, and Culpably Assisted the al-Qaeda Terror Syndicate's Campaign of Terrorism Against Americans in Afghanistan

Plaintiffs' detailed and robust allegations against HBL boil down to this: For over a decade, HBL knowingly and intentionally facilitated terrorist financing for members of the al-Qaeda Terror Syndicate, which used the millions of dollars that they raised and moved through HBL to attack Americans in Afghanistan. Through these actions, HBL both aided and abetted the attacks that injured plaintiffs, and also conspired with the perpetrators to further their terrorist campaign.

First, "HBL provided banking services to al-Qaeda, Haqqani Network, and LeT operatives and fundraisers knowing that the Syndicate would use the resulting funds to target U.S. citizens in terrorist attacks." ¶ 266. HBL did this "to harm Americans in Afghanistan and help drive America out of the country." ¶ 268. The bank "had two distinct but related reasons for desiring that outcome." *Id.* First, "HBL's management subjectively supported the mission of anti-American terrorists in Afghanistan," as evidenced by the multiple forms of support HBL intentionally

---

[2] HBL cites *Zobay* with a parenthetical saying that the court "dismiss[ed] ATA aiding-and-abetting claims." Mem. 12. HBL misleadingly obscures that the court *sustained* the claims against MTN Group. The court dismissed claims as to certain U.S.-based subsidiaries of Chinese telecom giant Huawei, but only because the court determined that the complaint did "not adequately tie the Huawei U.S. subsidiaries to" the parent's sanctions-evasion scheme. *Zobay*, 695 F. Supp. 3d at 351. That analysis is inapposite here because plaintiffs' complaint explains what HBL itself did.

provided to known terrorists. ¶ 269. Second, "HBL decided that harming Americans was the necessary price of maintaining a good relationship with . . . those elements within the ISI," a rogue Pakistani intelligence agency, "that frequently used HBL to achieve their objectives," including providing support to terrorists attacking Americans. ¶ 270.

This support took multiple forms. *First*, HBL opened and maintained accounts for a veritable "'Who's who' of major terrorists in the region," ¶ 228, including "Jalaluddin Haqqani, founder of the FTO Haqqani Network; Osama bin Laden; Hafiz Muhammad Saeed and Zafar Iqbal, the co-founders of designated FTO LeT," and other persons associated with, and entities fronting for, the al-Qaeda Terror Syndicate, ¶ 218; s*ee also* ¶¶ 161-168. These specific terrorists "are but a few examples" of how "HBL structured its business to be welcoming to terrorists." ¶ 5. *Second*, HBL engaged in a slew of irregular transactions, going "out of its way to clear the path" for terrorists to access the global financial system. *Id.* This included creating a "good guys" list whitelisting over 150 sanctioned persons, ¶¶ 5, 137-146, allowing anonymous wire transfers from suspicious customers (and stripping out information that would have alerted regulators to suspicious wires), ¶¶ 6, 147-150, and brazenly refusing to report suspicious transactions, ¶¶ 151-152. The amounts affected by this misconduct were significant. Improper use of the "good guy" list caused "at least $250 million" to flow through HBL's New York branch "without any screening." ¶ 142. Wire-stripping affected more than 13,000 transactions. ¶ 149. And HBL refused to report at least 200 instances of suspicious activity. ¶ 152. *Third*, HBL operated "as the unofficial bank of the Pakistani ISI, providing funding and financial services to the ISI's terrorist proxies in the region—all of which are also key affiliates of al-Qaeda, and members of the al-Qaeda Terror Syndicate." ¶ 169; *see also* ¶¶ 170-183 (detailing ISI-related allegations). *Fourth*, HBL provided banking services to Syndicate narco-terrorist Dawood Ibrahim. ¶¶ 184-192. *Fifth*, HBL operated a massive U.S.-dollar

clearing business for Al Rajhi Bank, which had "been linked through negative media to Al Qaeda and terrorism financing." ¶¶ 133-135. This business accounted for 24 percent of the transactions conducted through HBL's New York branch, worth tens of billions of dollars. ¶ 134 & n.112. HBL refused to scrutinize Al Rajhi Bank's transactions, even though the media and the U.S. Senate had drawn clear links between the bank and terrorist finance. ¶¶ 133-135.

None of these transactions were "routine." ¶ 193. This is for three reasons. First, "HBL staff and executives ignored numerous and obvious red flags" and shirked their legal responsibilities. *Id.* Second, "HBL also created the 'good guy' list in order to *excuse* certain terrorist customers from its standard diligence procedures," and such "deviations from policy and legal requirements cannot be characterized as 'routine' banking behavior." *Id.*; ¶ 145 (explaining that "[n]one of the[] transactions" involving the 'good guy' list "were 'routine' in any sense. Rather, they were the product of special rules and practices HBL followed for its terrorist clients"). Third, "the purpose of these transactions was to provide illegal support to terrorists engaged in extreme violence—an act that violates U.S. criminal law and cannot ever properly be regarded as routine." ¶ 194. By deploying "elaborate and non-routine policies and procedures designed to shield suspicious terrorism-related customers and transactors from scrutiny," HBL deviated from all norms of responsible banking. ¶ 136.

HBL "facilitate[d] at least several millions of dollars of financial transactions for the benefit of members and agents of al-Qaeda, the Haqqani Network, and LeT." ¶ 145; *see also* ¶¶ 159, 183, 250. HBL thus "participated in the financial infrastructure essential to terrorism against Americans in Afghanistan," including by "knowingly maintaining accounts and processing transactions for members of the al-Qaeda Terror Syndicate and their agents," ¶ 247, taking "deliberate steps that made it easy for members of the Syndicate to raise and move money without detection," ¶ 248,

and lending "its public profile as Pakistan's largest bank to terrorist fundraising efforts," ¶ 249. These financial contributions "helped pay for, *inter alia*, weapons, explosives, recruiting, salaries, and other necessary expenses to commit terror attacks." ¶ 251; *see also* ¶ 257. Indeed, HBL's unlawful financial machinations provided the Syndicate with enough money to commit the attacks in this case many times over. ¶ 252. "HBL played a crucial role in allowing members of the al-Qaeda Terror Syndicate . . . to perpetrate terrorist attacks because the amounts of U.S. dollars and other currencies that it funneled to these groups were high (millions of dollars), and the money was important to the Syndicate's ability to carry out violent attacks on Americans." ¶ 246.

Plaintiffs' allegations are corroborated by enforcement actions by the New York Department of Financial Services (NYDFS) and the Federal Reserve, which ultimately resulted in HBL paying a $225 million penalty and surrendering its license to operate in New York. ¶ 154. Contemporaneously with the resolution, NYDFS explained that HBL's conduct "open[ed] the door to the financing of terrorist activities that pose a grave threat to the people of this State and the financial system as a whole." *Id.* (quotation marks omitted). These enforcement actions occurred from 2006 through 2017. ¶¶ 8, 128-154. Throughout that time period, and thereafter, HBL knowingly and systematically helped terrorists and their agents use its banking infrastructure to raise, store, and move money—all while falsely promising to curb its misconduct. *See* ¶¶ 129-132.

HBL nitpicks the allegations, mostly complaining that they lack account- and transaction-level details tracing the funds moved through to the attacks in this case, and also observing that some transactions occurred years before the attacks. Mem. 2-8. But no case requires such granularity at the pleading stage. Instead, courts must "consider all of the complaint's allegations, rather than considering each in isolation, and . . . accept as true all permissible inferences that could be drawn from the complaint as a whole." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842,

865 (2d Cir. 2021). Here, plaintiffs allege a robust and long-running pattern of providing special treatment to people and entities associated with groups in the al-Qaeda Terror Syndicate including al-Qaeda, the Haqqani Network, LeT, and others that played roles in the attacks that injured plaintiffs. ¶¶ 128-152. Although some of plaintiffs' examples pre-dated the attacks, plaintiffs also plausibly allege that HBL was recalcitrant from before 2006 through 2017. *E.g.*, ¶¶ 157-158. Indeed, NYDFS and the Federal Reserve found that even after they warned HBL about its dangerous banking practices, HBL continued providing non-routine services to hundreds of dangerous customers affecting thousands of transactions, ¶¶ 132-153, "putting the integrity of the financial services industry and the safety of our nation at risk," ¶ 154. And "[t]he misconduct documented by U.S. regulators in 2015 and 2017 was but a small part of more than a decade of egregious criminal conduct." ¶ 158. Plaintiffs also identify investigations in Pakistan and the U.A.E. in 2019 and 2020 relating to additional violations. ¶¶ 155-156. These allegations collectively make it plausible "that HBL processed at least several million U.S. dollars in transactions for agents or operatives of the al-Qaeda Terror Syndicate." ¶ 159.

These allegations state claims for secondary liability under JASTA, which seeks to "'[p]rovide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

### B.  The Complaint States a Claim Under Controlling Precedent

#### 1.  *HBL Misconstrues the Supreme Court's Decision in Twitter*

The crux of HBL's argument for dismissal is that *Twitter* substantially narrowed ATA liability. HBL's argument depends on wrenching snippets from *Twitter* out of context, then using

those snippets to challenge various aspects of Second Circuit precedent. These attempts fail because HBL mischaracterizes both *Twitter* and the law in this Circuit.

As *Twitter* recognized, aiding and abetting is a common-law tort, and so underlying facts matter. *See* 598 U.S. at 487-88. Indeed, *Twitter* was "narrow in important respects" because it turned in substantial part on "the Court's view of the facts—including its characterizations of the social-media platforms and algorithms at issue." *Id*. at 506 (Jackson, J., concurring). The principal allegation in *Twitter* was that social media companies "failed to stop ISIS" from misusing their "generally available virtual platforms." 598 U.S. at 505 (majority op.). They committed no "affirmative misconduct"—just inadequately policed their platforms—and such allegations of "mere passive nonfeasance," absent any duty to act, did not state a claim. *Id.* at 500. As the Court noted, "both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance." *Id.* To impose liability for such passive nonfeasance, "a strong showing of assistance and scienter would thus be required." *Id.* The plaintiffs failed, however, to articulate any "nexus between th[e] assistance and the [at-issue] attack" or even show "any sort of affirmative and culpable misconduct that would aid ISIS." *Id*. at 505.

The Court applied a different analysis, however, to allegations that Google "shared advertising revenue with ISIS." *Twitter*, 598 U.S. at 505. In assessing those funding allegations, the Court invoked none of the common-law principles that had doomed the passive inaction claims. Rather, the Court dismissed the funding allegations because the plaintiffs "allege[d] nothing about the amount of money that Google supposedly shared" or the "number of accounts" involved. *Id.* Faced with a bare-bones complaint in which the amount of support could have been "only $50," the Court held that, "[w]ithout more," the plaintiffs had not "plausibly alleged" that the funding was substantial. *Id*. at 505-06.

11

Plaintiffs' allegations differ from those that failed in *Twitter*. Passive nonfeasance by social media companies is leagues away from HBL's affirmative steps—including using the "good guy" list, wire stripping, and actively dismissing red flags—facilitating terrorist financing in the highly regulated banking industry. Moreover, whereas social media companies have no independent duty to act, 598 U.S. at 501, myriad laws require banks "to know their customers," "perform due diligence," and "not provide banking services to terrorist organizations." *Kaplan*, 999 F.3d at 849; *see also* 31 U.S.C. § 5311 *et seq*. (Bank Secrecy Act); 31 C.F.R. Part 103 (OFAC Regulations); 12 C.F.R. § 211.24(f) & (j) (Federal Reserve Board of Governors Regulation K); ¶¶ 196, 199-217.

To the extent any allegations in *Twitter* resemble those here, it is the funding allegations against Google (which HBL ignores). Those allegations failed because the *Twitter* complaint did not plead the amount of assistance. Here, by contrast, HBL facilitated "access to millions of U.S. dollars . . . for al-Qaeda and other groups that perpetrated the attacks"—amounts that were "substantial by any metric." *King I*, 2022 WL 4537849, at *9; *see also* ¶¶ 10, 145-146, 159, 183, 246, 250. Thus, *Twitter* supports the sufficiency of these allegations.

HBL identifies three aspects of *Twitter* that it believes favor its arguments—but it overstates its case with respect to all three. *First*, HBL argues that it is not enough to aid a terrorist enterprise; the defendant must have assisted the act of terrorism that injured the plaintiffs. Mem. 10. But as this Court recognized in *King II*, HBL's "reading of the *Twitter* nexus requirement is too narrow," because the Supreme Court "left room for 'the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts.'" 2023 WL 8355359, at *3 (quoting *Twitter*, 598 U.S. at 502). The Supreme Court specifically gave the example of a "provider of routine services" who acts "in an unusual way," *Twitter*, 598 U.S. at 502, and this

Court recognized that plaintiffs "sufficiently allege that [HBL] provided non-'routine' banking services to terrorists and their allies," *King II*, 2023 WL 8355359, at *3 (quotation marks omitted).

HBL also elides *Twitter*'s holding that "people who aid and abet a tort can be held liable for other torts that were a foreseeable risk of the intended tort." *King II*, 2023 WL 8355359, at *2 (quoting *Twitter*, 598 U.S. at 496). Just as *Twitter* emphasized foreseeability as a middle ground between the defendants' strict-nexus argument and the plaintiffs' broad enterprise-liability theory, 598 U.S. at 495-96, 502, so does the Second Circuit, explaining that foreseeability is "central . . . to JASTA aiding-and-abetting," *Honickman*, 6 F.4th at 496-97; *see also Kaplan*, 999 F.3d at 860 (whether "knowingly providing material support to an FTO" constitutes aiding and abetting requires a "fact-intensive" inquiry). Here, the type of support HBL provided was essential to these terrorists' ability to carry out the types of attacks that occurred in this case, making the attacks a foreseeable consequence of HBL's culpable misconduct. ¶¶ 246-257. HBL also knew that its conduct was causing terrorist violence against Americans in the region. ¶¶ 229-242. Tellingly, HBL never disputes that the attacks in this case were a foreseeable risk of illicit terrorist finance.[3]

*Second*, HBL argues that under *Twitter*, "the 'knowing and substantial assistance' component of aiding-and-abetting liability is 'designed to capture the defendants' state of mind with respect to their actions and the tortious conduct," and is not the same as the "general awareness" element. Mem. 10-11 (quoting *Twitter*, 598 U.S. at 504). Again, this Court already considered that point and rejected HBL's contention that the Second Circuit conflates the "knowing" requirement with general awareness. Thus, the Court explained in *King II* that "[t]he analysis of 'knowing'

---

[3] HBL argues that "foreseeability alone is not sufficient to establish proximate cause." Mem. 19 (citing *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017)). As explained *infra* pp.21-22, proximate causation is not an element of JASTA aiding and abetting, and JASTA-specific authority holds that defendants are liable for foreseeable risks of their unlawful acts.

assistance as assistance that is neither innocent nor inadvertent goes beyond the 'general awareness' analysis, and is consistent with *Twitter*'s holding that the 'knowing' requirement is 'designed to capture the defendants' state of mind with respect to their actions and the tortious conduct.'" *King II*, 2023 WL 8355359, at \*3 (quoting *Twitter*, 598 U.S. at 504). *Twitter* also made clear that the "knowing" inquiry need not refer to knowledge of "the particular terrorist act"; knowledge of unlawful conduct suffices if acts of terrorism were foreseeable. 598 U.S. at 504.

In any event, plaintiffs' complaint makes specific allegations about HBL's state of mind with respect to its actions and the tortious conduct. Most pointedly, plaintiffs allege that "HBL's management subjectively supported the mission of anti-American terrorists in Afghanistan," ¶ 269, among a litany of other allegations alleging highly culpable scienter, ¶¶ 195-245. The fact that HBL's actions were not "routine" is further evidence of its culpability. ¶ 193-194.

*Third*, HBL argues that "the Supreme Court expressly incorporated the criminal standard for aiding-and-abetting liability," suggesting that the defendant "must intend to further terrorist activity" to be held liable. Mem. 11. This is false. In fact, the Court expressly stated that "nuances may establish daylight between the rules for aiding and abetting in criminal and tort law; we have described the doctrines as roughly similar, not identical." *Twitter*, 598 U.S. at 493 (cleaned up). Instead, the Supreme Court recognized that "JASTA employs the common-law term 'aids and abets,' pointing to *Halberstam*'s common-law 'framework' as the primary guidepost for understanding the scope of § 2333(d)(2)." *Id.* (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)); *see also Kaplan*, 999 F.3d at 860 ("intent is not itself a *Halberstam* element"). What is required is "conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 493. As this Court recognized in *King II*, "[t]his is consistent with *King I*'s description of what constitutes 'knowing' assistance." 2023 WL 8355359, at \*2.

To be sure, a higher showing of scienter may sometimes be necessary. As this Court recognized, "the twin requirements of 'knowing' and 'substantial' assistance worked in tandem, 'with a lesser showing of one demanding a greater showing of the other.'" *King II*, 2023 WL 8355359, at *2 (quoting *Twitter*, 598 U.S. at 491-92). Thus, in cases involving scant assistance, or passive nonfeasance, more culpable intent may be necessary. But the opposite is true when, as here, the defendant engages in active misconduct that provides substantial assistance.

The common-law cases the Supreme Court cited in *Twitter* bear this out. For example, the Court cited *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978) for the proposition that "[c]ulpability of some sort" is required to prevent "mostly passive actors like banks" from "becom[ing] liable for all of their customers' crimes by virtue of carrying out routine transactions." *Twitter*, 598 U.S. at 491 (quotation marks omitted). But in *Monsen* itself, the court recognized that even "inaction . . . may provide a predicate for liability where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of a wrongful act." 579 F.2d at 800. On the other hand, "the requirement of knowledge may be less strict where the alleged aider and abettor derives benefit from the wrongdoing." *Id*. at 799 (quotation marks omitted). In that circumstance, "proof that the alleged aider-abettor had general awareness that his role was part of an overall activity that is improper" shows "conscious involvement in impropriety or constructive notice of intended impropriety." *Id.* (quotation marks omitted). That lesser standard applies here because HBL derived substantial benefit from its role in terrorist finance, including profits from Al Rajhi Bank as well as ongoing business from the ISI. ¶¶ 134, 271. HBL also subjectively intended to assist the terrorists in their violent campaign. ¶¶ 268-269.

HBL also ignores *Twitter*'s reliance on *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004 (11th Cir. 1985), which held a bank liable for aiding and abetting a massive fraud when its

only misconduct was that an employee recklessly signed a letter vouching for the fraudsters' character without first "probing more deeply into [their] operations." *Id*. at 1012. *Woods* explained that when a "method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"—whereas transactions performed "in the ordinary course of . . . business" require "stronger evidence of complicity." *Id.* at 1009-10 (quotation marks omitted). Like *Monsen*, the court in *Woods* recognized that "a high degree of scienter" is required to impose liability on passive defendants who are not under any duty to act— but "a lesser degree of scienter" is required for defendants who act affirmatively or stay passive in the face of a duty. *Id*. at 1010. Applying that rule, *Woods* reasoned that although banks commonly write references for customers, it was not common to do so without conducting diligence. *Id*. at 1012. That *un*common transaction was sufficient to support an inference of scienter—even though the employee "may not have known of all the details of the primary fraud." *Id*.

 *Twitter*'s embrace of *Woods* shows that even ordinary banking tasks, done without specific intent to facilitate a tort, can support liability when performed under atypical circumstances. This echoes *Halberstam*'s admonition that acts that are "neutral standing alone . . . must be evaluated in the context of the enterprise they aided." 705 F.2d at 488. More recent common-law cases agree. *E.g.*, *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536-37 (6th Cir. 2000) (affirming aiding-abetting liability against bank for fraud when bank provided a four-day loan to customer— even though such loans were "lawful" and "commonplace," the bank did not know how the customer would use the loan to fraudulently obtain a bond, and the loan was not "necessary" to the scheme). *Woods* also underscores that banks have affirmative duties to inquire into their customers' activities that social media companies do not.

Fundamentally, HBL is wrong to suggest that a showing of intent to assist terrorist attacks is always required. When, as here, the plaintiffs allege that the defendant actively gave terrorists special treatment, conducted non-routine transactions, and provided millions of dollars of assistance against the backdrop of repeated government warnings that its conduct risked enabling terrorism, that is culpable enough under *Twitter*. But in any event, plaintiffs allege that HBL intended to aid the terrorists, which is a plausible inference from its years of support to high-profile terrorist leaders and operatives. ¶¶ 228, 269-271. HBL may dispute those allegations, but such disputes are for juries because evidence of scienter is frequently circumstantial. *See, e.g.*, *United States v. Anderson*, 747 F.3d 51, 61-62 (2d Cir. 2014).

2.    *The Complaint Alleges Knowing and Substantial Assistance*

HBL argues that its assistance was not "knowing and substantial." This inquiry involves six factors: (1) "the nature of the act assisted" or encouraged; (2) the "amount of assistance" given; (3) defendant's presence or absence at the time of the tort; (4) defendant's relationship to the primary tortfeasor; (5) "defendant's state of mind"; and (6) the "duration of the [defendant's] assistance." *Halberstam*, 705 F.2d at 488 (emphasis omitted). *Twitter* held that courts should not treat these factors as "a sequence of disparate, unrelated considerations without a common conceptual core." 598 U.S. at 504. But neither the Second Circuit nor this Court have ever made that error. Instead, Second Circuit precedent recognizes that "these factors are variables, and the absence of some need not be dispositive." *Kaplan*, 999 F.3d at 857 (quotation marks and citation omitted). Here, HBL does not discuss the *Halberstam* factors at all—but they easily weigh in favor of liability. Indeed, this Court already held as much in *King I*, 2022 WL 4537849, at *8-10 (holding that all but one of the *Halberstam* factors supported liability, and that the complaints alleged that

HBL provided "assistance that was both 'qualitatively and quantitatively substantial'" (quoting *Kaplan*, 999 F.3d at 866)).

Pressing for a contrary result, HBL argues that the allegations don't amount to substantial assistance because plaintiffs do not allege that HBL chose to participate in any specific terrorist attack. Mem. 12-15. Here, HBL misses the forest for the trees. The complaint's core allegation is that "HBL's customers used their accounts at the bank to hold and transfer huge sums, totaling at least several million dollars, to members of the al-Qaeda Terror Syndicate from 2006 through at least 2017." ¶ 250; *see also* ¶ 159 (alleging that HBL knowingly "processed at least several million U.S. dollars in transactions for agents or operatives of the al-Qaeda Terror Syndicate"). These contributions helped pay for weapons, explosives, recruiting, salaries, and other expenses to commit attacks. ¶ 251. And HBL provided these services knowingly, "intend[ing] to assist its terrorist customers in their effort to harm Americans," ¶ 269, and to maintain its relationship with the ISI, ¶ 270. At a minimum, "HBL chose to allow dangerous terrorist financing despite multiple warnings from government regulators that clearly identified the risk to the bank." ¶ 157. And, as the complaint makes clear, the specific examples therein were "but a small part of more than a decade of egregious criminal conduct." ¶ 158.

In this context, for the reasons explained *supra*, it is not necessary for plaintiffs to show that HBL knowingly sought to participate in any specific attack. Instead—as the Supreme Court recognized in *Twitter*, 598 U.S. at 502, the Second Circuit recognized in *Kaplan*, 999 F.3d at 866, and this Court recognized in *King I*, 2022 WL 4537849, at *10—by illegally providing special treatment to terrorist customers, HBL rendered itself liable for foreseeable acts of terrorism. And, as noted *supra*, HBL does not dispute that the attacks in this case were a foreseeable risk of providing millions of dollars to the Syndicate during the relevant time period.

3.    *The Complaint Alleges General Awareness*

JASTA's general awareness standard is permissive. To satisfy it, "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496. This is not an actual-knowledge standard; instead, the phrase "generally aware" connotes "something less than full, or fully focused, recognition." *Kaplan*, 999 F.3d at 863. Moreover, "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation marks omitted), and so controlling law requires courts to be "lenient in allowing scienter issues . . . to survive motions to dismiss"—even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 693 (2d Cir. 2009) (quotation marks omitted).

This Court held that identical allegations satisfied this element in *King*, 2022 WL 4537849, at *7-8. Since then, nothing has changed; *Twitter*, for example, held that this element was satisfied because "defendants knew they were playing some sort of role in ISIS' enterprise." 598 U.S. at 497. Here, plaintiffs allege that HBL's knowledge of its role went beyond general awareness. HBL knowingly adopted diligence policies *on paper*, many of which explicitly identified the need for strict controls to prevent terrorist financing, ¶¶ 196-217, and then systematically deviated from those policies to facilitate terrorist financing, ¶¶ 218-228. This was not "mere negligence" because "HBL chose to allow dangerous terrorist financing despite multiple warnings from government regulators that clearly identified the risk to the bank." ¶ 157. In NYDFS's words, HBL was "given more than sufficient opportunity to rectify its deficiencies," but it "utterly failed to do so." ¶ 132 (quotation marks omitted). Not only that, HBL knew from public sources what its terrorist customers were doing, ¶ 229, and knew from a previous lawsuit as well as statements from

19

multiple governments that its support for its terrorist customers caused violence against Americans, ¶¶ 230-242. Thus, "HBL's policies, understanding of the purpose of those policies, and conduct contrary to them establish that it was at least generally aware that it was playing a role in the al-Qaeda Terror Syndicate's overall tortious scheme to commit terrorist violence by facilitating terrorist financing to members of the Syndicate." ¶ 245.

Beyond all that, plaintiffs allege that "HBL's motivation for assisting al-Qaeda, the Haqqani Network, and LeT was to harm Americans in Afghanistan and help drive Americans out of the country." ¶ 268. This was both because (i) "HBL's management subjectively supported the mission of anti-American terrorists in Afghanistan," ¶ 269, and (ii) HBL wished to curry favor with the ISI, ¶¶ 270-271. These are clear allegations of awareness.

HBL responds that it provided some of the services well before the attacks, and it denies that it had knowledge of other customers' connections to terrorism. Mem. 15-18. These arguments miss the point: HBL knowingly serviced terrorist customers for over a decade, to such a degree that it was forced to pay a $225 million fine and leave the United States. HBL serviced those customers because it wished to harm Americans. The complaint's examples lend those allegations plausibility—and plausible allegations of scienter satisfy plaintiffs' pleading burden.

> 4. *Designated FTOs Committed, Planned, and/or Authorized Each Attack in This Case*

Each of the attacks was committed by one or more designated FTOs—primarily al-Qaeda (designated in 1999) and the Haqqani Network (designated in 2012)—often as part of joint cells. Most of the attacks were committed by al-Qaeda and the Haqqani Network together. ¶¶ 351, 364, 376, 390, 397, 409, 415, 425. Three were committed by al-Qaeda with the Taliban. ¶¶ 456, 473, 495. And two were committed by the Haqqani Network, ¶¶ 447, 466, but nevertheless planned or authorized by al-Qaeda, ¶¶ 306-342. As support for these attributions, the complaint details how

the al-Qaeda Terror Syndicate functioned, describing the roles that organizations played, and how they coordinated with each other. ¶¶ 21-126, 293-350.

This Court held in *King I* that substantively identical allegations "sufficiently allege[d] that each of the attacks . . . was committed, planned, or authorized by al-Qaeda or one of the Syndicate FTOs." 2022 WL 4537849, at *5. The court detailed plaintiffs' allegations and showed how they meet plaintiffs' pleading burden. *Id*. at *6. In response, HBL contends that the Syndicate of terrorists does not really exist, and that plaintiffs allege nothing more than "general support" from al-Qaeda to the Taliban. Mem. 18-19. This Court already rejected those same arguments in *King I*, and every other court that has considered similar allegations has accepted them. *See, e.g.*, *Cabrera v. Islamic Republic of Iran*, 2024 WL 864092, at *2 (D.D.C. Feb. 29, 2024); *Zobay*, 695 F. Supp. 3d at 335-36; *Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, at *9 (S.D.N.Y. Mar. 7, 2023). The Court should do the same here.

### 5.   *Proximate Causation Is Not an Element of Secondary Liability*

Proximate causation is not an element of JASTA aiding and abetting. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018) (explaining that under JASTA, the argument that the defendant's conduct did not proximately cause the plaintiff's injury "provides no ground for reversal" as long as the terrorists the defendant assisted did cause the injury); *see also id.* at 333; *contra* Mem. 19-20. Indeed, no case lists "proximate cause" or "directness" as an element of a JASTA claim, and the Second Circuit has repeatedly rejected a "directness" requirement. *See Honickman*, 6 F.4th at 494 (listing elements (which do not include proximate cause) and noting that Congress intended to impose liability on those who support terrorism indirectly); *Kaplan*, 999 F.3d at 866 ("[A] JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly."); *see also* JASTA § 2(b) (expressing

Congressional purpose to reach indirect supporters of terrorism). Instead, as the D.C. Circuit explained in *Halberstam*, a defendant is "liable for injuries caused by the acts of the person assisted when the acts were not specifically contemplated by the defendant at the time he offered aid" if the events that caused the injuries were "foreseeable." 705 F.2d at 483; *see also id*. at 488 (imposing liability for murder as a "foreseeable risk" of "personal property crime at night").

The cases HBL cites (at Mem. 19-20) to support this phantom proximate causation requirement either hold that proximate causation is required for primary liability claims[4] or for aiding and abetting claims under New York state law.[5] These cases are inapposite because they do not address the relevant cause of action. In any event, plaintiffs allege causation. *E.g.*, ¶ 526.

### III.    The Complaint Pleads Conspiracy

This Court in *King I* sustained the conspiracy claim, holding that the complaint's allegations "are sufficient to make the plausible inference that [HBL] had an agreement to further its customers' campaign of terrorism and shared a common purpose to do so." 2022 WL 4537849, at *10. Thus, the Court credited the allegation that HBL "shared al-Qaeda's goal of driving the U.S. military out of Afghanistan," and deemed that allegation "plausible in light of the many allegations of [HBL's] support for al-Qaeda." *Id.* Then, in *King II*, the Court held that the Second Circuit's decision in *Freeman* only "clarified the law in ways that support *King I*'s ruling." 2023 WL 8355359, at *4.

HBL nevertheless invokes *Freeman*, arguing that the alleged conspiracy was merely to evade sanctions, and that the attacks were not acts in furtherance of that conspiracy. Mem. 20-21. But

---

[4] *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018) (cited at Mem. 19) is particularly inapt because the ATA conspiracy claim there was asserted under the ATA's *primary liability* provision—not JASTA's secondary liability provisions.

[5] *E.g.*, *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (cited at Mem. 19).

plaintiffs allege that "HBL joined a conspiracy to commit terrorist attacks against Americans," ¶ 289, and that the attacks were "acts in furtherance of the conspiracy," and indeed its "primary objective," ¶ 292. HBL also argues that it would be implausible to infer that it joined a conspiracy based only on its provision of banking services. Mem. 21. But plaintiffs allege much more than that. In particular, they allege that HBL's management subjectively supported the terrorists, ¶ 269, and that HBL provided support to terrorists knowing that they would use that support to harm Americans, ¶¶ 198, 229-245, 259, 262-268, 270-271. Plaintiffs also expressly disclaim that HBL provided routine banking services. ¶¶ 136, 145, 193-194. Thus, none of the arguments HBL now makes justify departure from the result in *King*.

## IV. The Complaint Pleads Primary Liability

Plaintiffs respectfully maintain that the complaint adequately alleges the elements of primary liability under the ATA for the reasons set forth in the plaintiffs' opposition to HBL's motion to dismiss in *King. King* ECF 53, at 21-25. Plaintiffs recognize, however, that the Court dismissed virtually identical primary-liability claims in *King I*, and that the same result is likely here. Nevertheless, plaintiffs preserve these claims for potential appeal after final judgment by arguing that the complaint's allegations satisfy all the requisite elements of the cause of action. Specifically, HBL's monetary support to terrorists was so substantial, and so intentional, that it amounts to a criminal act that was dangerous to human life, thus constituting an act of international terrorism. ¶¶ 524-525, 530-535. This misconduct proximately caused plaintiffs' injuries by providing the Syndicate with resources to carry out the attacks. ¶¶ 526, 536.

## V. Plaintiffs Have Established a Prima Facie Case of Personal Jurisdiction

HBL acknowledges that this Court already concluded that virtually identical allegations pleaded a prima facie case of personal jurisdiction under controlling precedent. Mem. 23. It offers no reason for the Court to revisit that determination now.

Specific personal jurisdiction exists when a bank uses a New York branch to process transactions that underlie or relate to the plaintiff's claims. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169-71 (2d Cir. 2013). "Since *Licci*, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name." *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (collecting cases). This is so even when transfers flowing through New York constitute only "a part of" the offending activity. *Licci*, 732 F.3d at 170; *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

HBL maintained a New York branch, using it to process wire transfers and currency exchanges, and also to make U.S. dollars (the preferred currency of terrorist groups like al-Qaeda) available to terrorists worldwide. ¶¶ 272-288. These transactions prompted NYDFS to accuse HBL and its New York branch of opening the door to terrorist financing, including allowing millions of dollars in thousands of transactions to flow through the branch without adequate screening, and approving transactions by individuals with ties to terrorist groups. *See id*. ¶¶ 132-154.

HBL disputes these allegations, describing them as speculative or insisting that none were connected to terrorism. Mem. 23-25. But the complaint alleges otherwise—and the Court must credit those allegations, as it previously did when holding that it was "plausible that transactions for terrorists and their funders and fronts were processed through [HBL's] New York branch undetected, and that [HBL] executed banking transactions in New York in order to aid and abet terrorism." *King I*, 2022 WL 4537849, at *3. Indeed, the Court rejected the same argument HBL now makes. *See id.* (holding that it was a "reasonable inference and allegation that terrorist

transactions took place repeatedly through [HBL's] New York branch" notwithstanding HBL's denials).

HBL pays lip service to plaintiffs' other well-pleaded bases for personal jurisdiction—HBL's conduct directly targeted at the United States and conspiracy jurisdiction—while conceding that either of these, standing alone, would suffice. In response, HBL merely asserts that nothing in the complaint supports an inference that HBL intended to support terrorist activity. HBL is wrong. As an initial matter, Congress's express findings in JASTA itself make clear that entities that contribute resources to anti-American terrorist groups "*necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.*" JASTA § 2(a)(6) (emphasis added). Plaintiffs allege HBL did precisely that by knowingly supporting entities and organizations that "were expressly targeting the United States and Americans," seeking to "influence U.S. policy" by "effect[ing] a withdrawal of coalition forces from Afghanistan," and also "to murder Americans as commanded in Osama bin Laden's 1998 *fatwa*." ¶¶ 262-264. Plaintiffs also allege that HBL shared this goal based on its improper use of the "good guy" list, its facilitation of the ISI's support for Syndicate terrorists, and its provision of critical financial services to key terrorists. ¶¶ 268-271. These allegations, taken as true (as they must be), establish specific personal jurisdiction under *Licci* and its progeny. Plaintiffs' allegations that HBL knowingly provided direct support to terrorists also suffice under Second Circuit precedent. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013).

## CONCLUSION

HBL's motion to dismiss should be denied.

Respectfully submitted,

s/Tejinder Singh

Ryan R. Sparacino (pro hac vice)
Tejinder Singh (TS0613)
Adam Goldstein (AG0318)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I caused true and correct copies of the foregoing

memorandum of law to be served on all counsel of record using this Court's CM/ECF system.


<u>s/Tejinder Singh      </u>

Tejinder Singh (TS0613)