UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                             :
KARIM HAKIMYAR, et al.,                                      :
                                      Plaintiffs,            :
                                                             :          24 Civ. 993 (LGS)
                     -against-                               :
                                                             :      <u>**OPINION AND ORDER**</u>
HABIB BANK LIMITED,                                          :
                                      Defendant.  :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs filed this case on February 9, 2024, against Defendant Habib Bank Limited

("HBL").  Plaintiffs in this case are 67 individuals who were injured or whose family members

were injured or killed in terrorist attacks, and bring this action under the Anti-Terrorism Act

("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C.

§ 2333(a) and (d).  Defendant moves to dismiss all claims.  For the reasons below, the motion is

granted in part and denied in part.

## I.  BACKGROUND

      The following facts are taken from the Complaint, its attachments and documents it

incorporates by reference.  *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021).  These facts are

assumed to be true for purposes of this motion and are construed in the light most favorable to

Plaintiffs as the non-moving party.  *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53

(2d Cir. 2022).

### A.  Allegations

      Plaintiffs were injured or had family members who were injured or killed in terrorist

attacks in Afghanistan between 2014 and 2017.  Each attack is alleged to have been committed

by al-Qaeda, the Taliban and related entities such as the Haqqani Network and the Kabul Attack Network.  The United States Department of State designated al-Qaeda as a Foreign Terrorist Organization ("FTO") in 1999.  The Complaint alleges that al-Qaeda acted in conjunction with other terrorist organizations as part of an organized and coordinated syndicate (the "al-Qaeda Terror Syndicate").  These coordinated groups include Lashkar-e-Taiba ("LeT"), Jaish-e-Mohammed ("JeM") and its alter ego Al-Rehmat Trust ("ART"), the Afghan Taliban, including the Haqqani Network, and the Pakistani Taliban.  LeT and JeM were designated as FTOs in 2001; ART and the Pakistani Taliban in 2010; and the Haqqani Network in 2012.  Outside of the Haqqani Network, the Afghan Taliban has not been designated an FTO for purposes of the ATA and JASTA, but was considered a terrorist organization for some purposes by the U.S. government during the period in which the attacks at issue here took place.  The Kabul Attack Network is alleged to be a part of the al-Qaeda Terror Syndicate led by al-Qaeda, the Taliban and the Haqqani Network and to be made up of cells comprising individuals from other syndicate groups such as LeT.

Defendant is the largest commercial bank in Pakistan.  Until 2017, Defendant operated a branch in New York.  Defendant is alleged to have provided banking services for decades to terrorists, fronts and fundraisers with direct connections to al-Qaeda, including Osama bin Laden; Jalaluddin Haqqani, founder of the Haqqani Network; Hafiz Muhammad Saeed and Zafar Iqbal, founders of LeT; Al Rashid Trust, an al-Qaeda front; Al-Rehmat Trust, a JeM front; Dawood Ibrahim, founder of the al-Qaeda-linked terrorist and criminal group D-Company; and Pakistan's Inter-Services Intelligence.  One of Defendant's largest U.S. dollar clearing accounts has been Al Rajhi Bank, which the U.S. government and media have linked to al-Qaeda and terrorism financing.

As a bank, Defendant operates in a highly regulated sector, subject to rigorous due diligence, anti-money laundering ("AML") and "Know-Your-Customer" requirements. Over the last twenty years, Defendant repeatedly has been investigated and penalized for flouting these regulations in ways that have enabled funding to flow to terrorists. Defendant is alleged, among other issues, to have placed terrorists and those linked to terrorists on a "good guy list" of individuals ostensibly pre-cleared for reduced scrutiny of their transactions. Defendant is alleged to have engaged in "wire-stripping," or removing identifying information from wire transactions, to obscure transactions involving terrorists and those linked to terrorists.

Defendant first agreed to address these AML deficiencies in 2006, when Defendant was investigated by the New York Department of Financial Services ("NYDFS") and Federal Reserve Board of Governors, which resulted in a written agreement for Defendant to augment its AML procedures. In 2015, Defendant entered into a consent order with NYDFS because of continued AML deficiencies in contravention of the 2006 written agreement. Pursuant to the 2015 consent order, Defendant agreed to engage a third party to review Defendant's U.S. dollar clearing funds to determine whether Defendant had properly identified suspicious activity involving high risk customers. In 2017, NYDFS charged Defendant with violating the 2015 consent order due to serious, persistent and fundamental deficiencies in Defendant's AML and compliance infrastructure, including Defendant's "good guy list," "wire stripping" and lack of diligence with customers like Al Rajhi Bank. Defendant settled for a $255 million fine and loss of its New York banking license. NYDFS concluded that Defendant's activity had "open[ed] the door to the financing of terrorist activities that pose[d] a grave threat to the people of this State and the financial system as a whole."

### B. Procedural History

This case is related to three consolidated cases, *King v. Habib Bank Ltd.*, No. 20 Civ. 4322 (S.D.N.Y.); *Alexander v. Habib Bank Ltd.*, No. 21 Civ. 2351 (S.D.N.Y) and *Border v. Habib Bank Ltd.*, No. 21 Civ. 6044 (S.D.N.Y.) (the "Related Actions"), also before this court. The Complaint in this action is substantially identical to those in the Related Actions. This action and the Related Actions assert the same claims against Defendant HBL based on nearly identical factual allegations but are brought by different groups of plaintiffs.

A motion to dismiss in the Related Actions was granted in part and denied in part. *See King v. Habib Bank Ltd.*, Nos. 20 Civ. 4322, 21 Civ. 2351, 21 Civ. 6044, 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ("*King I*"). Specifically, *King I* granted HBL's motion in part and dismissed the plaintiffs' primary liability claims under the ATA, denied the motion with respect to the secondary liability claims and denied the motion for lack of personal jurisdiction without prejudice to renewal after jurisdictional discovery. *Id.* at *11.

HBL moved for reconsideration of *King I*, which was denied. *King v. Habib Bank Ltd.*, No. 20 Civ. 4322, 2023 WL 8355359, at *1 (S.D.N.Y. Dec. 1, 2023) ("*King II*"). Defendant's motion for reconsideration argued that *King I*'s holding allowing the secondary liability claims to proceed should be reversed based on two purported changes of law: (1) the Supreme Court decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), and (2) the Second Circuit decision in *Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023). *King II*, 2023 WL 8355359, at *1. *King II* held that *Twitter* was not in tension with the holding of *King I* and that the Second Circuit had not abrogated the relevant binding precedent upon which *King I* relied. *Id.* at *3. *King II* also held that *Freeman* did not provide a basis for reconsideration because that decision

clarified the law in ways that support *King I*'s ruling and did not change the law in a way that would compel a different result. *Id.* at *4.

This action was filed on February 9, 2024. Defendant has moved to dismiss on the same grounds as in *King I* and *King II*.

## II.     STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).[1]  To withstand a motion to dismiss, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020).  It is not enough for a complaint to allege facts that are consistent with liability; it must "nudge[] . . . claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, "plaintiffs must provide the grounds upon which their claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019).

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

III.    DISCUSSION

Defendant argues that (1) the Complaint fails to plead a basis for personal jurisdiction over Defendant because the claims do not arise out of Defendant's purposeful availment of the privilege of doing business in New York; (2) the Complaint fails to state a primary liability claim because the Complaint includes insufficient facts to plead that Defendant perpetrated an act of international terrorism and that Defendant caused Plaintiffs' injuries and (3) the Complaint fails to state a secondary liability claim in light of *Twitter* and *Freeman*.  For the reasons below, Defendant's arguments regarding personal jurisdiction and secondary liability fail, but the motion is granted as to the claims of primary liability.

### A. Personal Jurisdiction

As in *King I* and for the same reasons, the Complaint sufficiently pleads facts to support personal jurisdiction.  *See* 2022 WL 4537849, at *3.  To the extent Defendant wishes to raise a factual challenge to jurisdiction, Defendant may renew its motion after jurisdictional discovery.

 "Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021).  There is no dispute as to the propriety of service on Defendant.

Plaintiffs argue that jurisdiction is proper under the New York long-arm statute, CPLR § 302(a)(1), as Defendant is alleged to have "transacted business" within New York.  "The CPLR 302(a)(1) jurisdictional inquiry is twofold: under the first prong the defendant must have

conducted sufficient activities to have transacted business in the state, and under the second

prong, the claims must arise from the transactions." *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 7

(N.Y. 2016). Similarly, "[f]or a State to exercise jurisdiction consistent with due process, the

defendant's suit-related conduct must create a substantial connection with the forum State."

*Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Specific personal jurisdiction exists if a defendant is alleged to have selected and

repeatedly used "New York's banking system[] as an instrument for accomplishing the alleged

wrongs for which the plaintiffs seek redress . . . ." *Licci ex rel. Licci v. Lebanese Canadian*

*Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). *Licci* has been followed in a series of terrorism-

financing cases in this Circuit, which have held that "jurisdiction lies over banks that executed

funds transfers in New York, [including] through their New York branch." *Bartlett v. Société*

*Générale de Banque Au Liban SAL*, No. 19 Civ. 7, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25,

2020) (collecting cases).

The Complaint alleges sufficient facts from which to infer that Defendant used New

York's banking system, through Defendant's use of its New York branch, "as an instrument to

achieve the very wrong alleged," that is, "to further [al-Qaeda's] terrorist goals." *Licci*, 732 F.3d

at 171. As in the Related Action, the Complaint here alleges that nearly a quarter of the

transactions conducted through Defendant's New York branch were for Al Rajhi Bank, a known

funder of al-Queda, during the period in which the terrorist attacks at issue occurred and after Al

Rajhi Bank's ties to terrorists were publicly known. The Complaint also alleges that certain

practices by Defendant, such as a "good guy list" and "wire stripping," were intended to reduce

the level of scrutiny for transactions by certain customers, likely including terrorists. These

alleged practices make it plausible that transactions for terrorists, their funders and their fronts

7

were processed through Defendant's New York branch undetected and that Defendant executed banking transactions in New York to aid and abet terrorism, which is the "conduct that could have subjected them to liability under the ATA."  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016).  Because the Complaint sufficiently alleges personal jurisdiction based on Defendant's own purposeful availment of the New York banking system and transacting business in New York in connection with the claims, there is no need at this time to decide whether the Complaint adequately pleads other bases for personal jurisdiction.

As explained in *King I*, recent Second Circuit precedent such as *Daou* is not to the contrary.  *See King I*, 2022 WL 4537849, at *3; *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 128-33 (2d Cir. 2022).  The facts here are analogous to those in *Licci* and not *Daou* because Defendant's "use of its [New York] account to transfer money provided money for [al-Qaeda] to carry out terrorist violence[,]" which was not the case in *Daou*.  *Daou*, 42 F.4th at 130-31.

The Court need not consider at this stage Defendant's factual arguments challenging jurisdiction.  "[W]hile a district court may refer to evidence outside the pleadings when resolving a 12(b)(1) motion, it is not invariably required to consider such evidence," and it is not error for a court to rule based solely on the allegations in the complaint if those allegations are not controverted by extrinsic evidence.  *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022).  The allegations that Defendant's New York branch suffered from compliance failures that rendered the branch unusually friendly to terrorists support a reasonable inference that terrorist transactions occurred repeatedly through Defendant's New York branch, even though no specific transactions have been identified.

### B. Primary Liability Claims

The Complaint fails to plead a claim for primary liability because the alleged banking services provided by Defendant were not themselves acts of international terrorism. "The ATA affords a civil remedy to persons injured 'by reason of an act of international terrorism.'" *Linde v. Arab Bank, PLC*, 882 F.3d 314, 325 (2d Cir. 2018) (quoting 18 U.S.C. § 2333(a)). The ATA's primary liability provision, § 2333(a), predates Congress's enactment in JASTA of a separate secondary-liability provision, and thus § 2333(a) "afford[s] civil relief only against the principals perpetrating acts of international terrorism." *Id.* at 319; *accord Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019). To survive a motion to dismiss, a primary liability claim "must allege[] (1) an injury to a U.S. national, (2) an act of international terrorism," perpetrated by Defendant "and (3) causation." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019); *see* 18 U.S.C. § 2333(a).

International terrorism is defined in part as "activities that . . . involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State," and that appear to have terrorist intent, i.e., intent "to intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(A)-(B).

The Complaint alleges two predicate criminal violations: material support for terrorism both under § 2339A and under § 2339B of Title 18 of the U.S. Code. Section 2339A criminalizes "provid[ing] material support . . . knowing or intending that [it is] to be used in preparation for, or in carrying out" violations of various other criminal statutes, including "kill[ing] a national of the United States, while such national is outside the United States." 18

U.S.C. §§ 2339A(a), 2332(a).  Section 2339B criminalizes "provid[ing] material support or resources to a foreign terrorist organization" designated as such "under section 219 of the Immigration and Nationality Act," knowing that the organization either "is a designated terrorist organization" or "has engaged or engages in terrorism."  18 U.S.C. § 2339B(a)(1), (g)(6).

Plaintiffs do not argue that this alleged material support is itself a violent act, but rather argue that the Complaint's allegations state a primary liability claim because Defendant's monetary support of terrorists was so substantial and intentional that it amounts to a criminal act "dangerous to human life," therefore meeting the statutory definition of international terrorism. For the reasons provided in *King I*, these allegations are insufficient to state a primary liability claim.  *See* 2022 WL 4537849, at *4-5.  Recent Second Circuit precedent recognizes that primary liability may lie where banking services are directed at a specifically identifiable violent or dangerous act, such as where "bank transfers were explicitly identified as payments for suicide bombings."  *Linde*, 882 F.3d at 321, 327.  But liability for banking services provided to support a terrorist group's mission should be analyzed under the aiding and abetting provision of JASTA.  *See, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 529, 532 (S.D.N.Y. 2019) (holding that alleged "provision of financial services" to known Hizbollah affiliates "does not, in itself, equate to international terrorism" despite allegation that defendant provided banking services "in order, among other things, to assist and advance Hizbollah's terrorist activities"), *vacated in part on other grounds*, 999 F.3d 842; *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 162 (2d Cir. 2021) (affirming grant of summary judgment to defendants where there was no "evidence that the transfers by [defendant] involved violence, or danger to human life" because, for example, they were not "explicitly identified as payments for violent acts like "suicide bombings").

10

The Complaint alleges that Defendant provided financial services to terrorists and the "purpose of these transactions was to provide illegal support to terrorists engaged in extreme violence." The Complaint does not, however, allege the kind of direct connection to violence or endangerment of human life that would render such financial services "acts of international terrorism." The primary liability claims are dismissed.

### C. Secondary Liability Claims

Under JASTA's secondary liability provision, "for an injury arising from an act of international terrorism committed, planned, or authorized by" an organization designated as an FTO "as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). "[P]erson" includes both individuals and entities. 18 U.S.C. § 2333(d)(1); 1 U.S.C. § 1.

For the reasons stated in *King I* and *King II*, Defendant's motion to dismiss the claims of secondary liability is denied because the Complaint sufficiently alleges that Defendant aided and abetted al-Qaeda's campaign of terrorism and joined a conspiracy, the object of which included the attacks at issue. As a threshold matter and as explained in *King I*, the Complaint sufficiently alleges that the attacks at issue were committed, planned or authorized by organizations designated as FTOs. *See* 2022 WL 4537849, at *6. The Complaint includes allegations that certain attacks were carried out by specific al-Qaeda operatives, and allegations that other attacks were committed pursuant to al-Qaeda-disseminated training and under its authority and religious authorization. Contrary to Defendant's argument that these allegations are too generalized, the Complaint includes sufficient allegations regarding who carried out the attacks, how the relevant

organizations worked together and how they variously provided organization, training and personnel for the attacks to render these allegations plausible.

### 1. Aiding and Abetting Liability

The Complaint includes sufficient allegations to support a claim that Defendant aided and abetted these attacks. "Congress in enacting JASTA stated that the proper legal framework for assessing JASTA claims is that set out in" *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which "articulated three elements of aiding-and-abetting liability: (1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation." *Kaplan*, 999 F.3d at 856. As stated above, the "wrongful act" element is satisfied by the FTO-committed attacks that injured Plaintiffs.

### a. General Awareness

Defendant was generally aware of its role in terrorism at the time it provided assistance. "[G]eneral awareness" carries "a connotation of something less than full, or fully focused, recognition" and does not require that the defendant "knowingly and intentionally supported" the terrorist organization in perpetrating the attacks. *Kaplan*, 999 F.3d at 863. A complaint may "contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind. However, plaintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge." *Id.* at 864. The question here is whether "Plaintiffs plausibly allege the . . . [c]ustomers were so closely intertwined with [the al-Qaeda Terror Syndicate's] violent terrorist activities that one can reasonably infer that [Defendant] was generally aware while it was providing banking services to

12

those entities that it was playing a role in unlawful activities from which [the al-Qaeda Terror Syndicate's] attacks were foreseeable[.]" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021).

The Complaint gives rise to a reasonable inference that Defendant knew its customers were integral to al-Qaeda's overall campaign of terrorism. The allegations supporting that inference are sufficient to allege the general awareness element under *Halberstam*. Specifically, the Complaint alleges that the relationships between FTOs, like al-Qaeda, and Defendant's customers, such as Al Rajhi Bank and Al Rashid Trust, were well known. The Complaint includes allegations regarding the services Defendant provided to both Al Rajhi Bank and Al Rashid Trust, including services provided to Al Rajhi Bank while the attacks were ongoing and to Al Rashid Trust and its affiliated entities until shortly before the alleged attacks occurred. Both customers are alleged to have well-documented, public links to al-Qaeda, and Al Rashid Trust was a known al-Qaeda front. Defendant is also alleged to have provided banking services and maintained accounts for various individuals, including the founders of al-Qaeda, the Haqqani Network and LeT, and a front for JeM, despite their being placed on the U.S. government's Specially Designated Nationals and Blocked Persons list or designated as Specially Designated Global Terrorists. These allegations, if true, are sufficient to show that certain of Defendant's customers were closely intertwined with the al-Qaeda Terror Syndicate and give rise to the reasonable inference that Defendant was generally aware, during the relevant period, that its services were helping to facilitate the al-Qaeda Terror Syndicate's unlawful activities.

As explained in *King I*, in contrast to the allegations found deficient in *Siegel*, 933 F.3d at 224, the allegations here plausibly allege that Defendant provided more than routine banking services to terrorists and those linked to terrorists, and as a result, Defendant was generally aware

13

of its role in terrorist activities. *See King I*, 2022 WL 4537849, at *7. Specifically, the allegations in the Complaint regarding the "good guy list" allege that Defendant affirmatively chose to ignore red flags regarding these individuals, such as their designation as Specially Designated Nationals, and chose to insulate their transactions from scrutiny designed to expose violations of international sanctions and to prevent the flow of money to terrorists. These allegations, especially when combined with the other allegations of extensive compliance failures and repeated regulatory issues that put Defendant on notice that its actions were facilitating the flow of funds to a web of well-known terrorist organizations, support a stronger inference of general awareness than existed in *Siegel*. The allegations in *Siegel* suggested only that the defendant had provided routine banking services to Al Rajhi Bank that ended as soon as links to terrorism were discovered, and not that the banking services provided had any actual links to terrorists or terrorist organizations. *Siegel*, 933 F.3d at 224. Here, the Complaint does provide the link between the services provided by Defendant and terrorism, allowing the conclusion that Defendant was generally aware of its role in the alleged terrorist activities.

Defendant argues that the allegations do not support a finding of general awareness because the allegations fail to create a temporal link between Defendant's awareness of its customers' connections with terrorism, its provision of services to those customers and the attacks at issue. The Complaint alleges that, from 2014 through 2017, transactions with Al Rajhi Bank represented approximately a quarter of the transactions through Defendant's New York branch, while Al Rajhi Bank's connections to terrorism were publicly known since at least 2012. Similarly, the Complaint alleges that since 2006, Defendant repeatedly was subject to regulatory action by the NYDFS and the State Bank of Pakistan, a Pakistani regulatory body, arising from Defendant's compliance issues which created a high risk that Defendant was providing services

14

that helped fund terrorist activity.  The Complaint also alleges Defendant's long-running practice

of flouting international safeguards intended to prevent the financing of terrorist organizations,

and includes allegations that Defendant continued to provide services throughout the period of

the attacks at issue in a manner that multiple regulatory authorities found to lead to the evasion

of sanctions against terrorism.  Defendant is correct that certain allegations pre-date the attacks at

issue, but the Complaint sufficiently alleges that Defendant was generally aware of its role

during the relevant period.

### b.  Knowing and Substantial Assistance

The Complaint sufficiently alleges that Defendant provided knowing and substantial

assistance to al-Qaeda and its proxies, which allowed them to evade sanctions and engage in

terrorist acts.  The requirement that assistance be "knowing" is satisfied if "the defendant

knowingly -- and not innocently or inadvertently -- gave assistance."  *Honickman*, 6 F.4th at 499-

500.  In *Halberstam*, "it was not necessary that [the defendant] knew specifically that [the

principal] was committing burglaries.  Rather, when she assisted him, *it was enough that she*

*knew he was involved in some kind of personal property crime at night* . . . because *violence and*

*killing is a foreseeable risk in any of these enterprises*."  *Kaplan*, 999 F.3d at 857.  Put

differently, knowing assistance does not require the defendant "to know anything more about

[the principal's] unlawful activities than what [the defendant] knew for the general awareness

element."  *Honickman*, 6 F.4th at 500; *accord Kaplan*, 999 F.3d at 864.  The determination of

whether the assistance was "substantial" is guided by six factors: "(1) the nature of the act

encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or

absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of

mind, and (6) the period of defendant's assistance."  *Kaplan*, 999 F.3d at 856.

As discussed in *King I*, the alleged facts weigh in favor of finding that Defendant's assistance was knowing and substantial. *See* 2022 WL 4537849, at *9-10. First, the nature of the act encouraged was violent terrorist attacks. The Complaint sufficiently alleges that even small amounts of funding make a large impact on the kinds of heinous attacks alleged and that the al-Qaeda Terror Syndicate relies heavily on donations of the type that are alleged to have been facilitated by Defendant. The heinousness of the attacks is relevant because "a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." *Kaplan*, 999 F.3d at 857.

The second factor favors a finding of substantial assistance because the Complaint alleges that Defendant's services played an important role in the flow of millions of U.S. dollars to the al-Qaeda Terror Syndicate that perpetrated the attacks. The amount of these funds is substantial, and in considering the amount of assistance, "Plaintiffs did not need to allege the funds actually went to [the FTO]. Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice." *Honickman*, 6 F.4th at 500. That inference is supported here by the Complaint's allegations regarding the well-known relationships between Defendant's customers and the FTOs that planned, authorized and committed the attacks.

The fourth factor also weighs in favor of finding substantial assistance. This factor concerns Defendant's "capacity to assist," and "a direct relationship [with] the FTO is not required to satisfy this factor." *Id.* at 500-01. Defendant again relies on *Siegel* to argue that the banking services Defendant provided to Al Rajhi Bank were "routine" and did not constitute substantial assistance. *See* 933 F.3d at 223, 225-26. As discussed above, the type of assistance

provided by Defendant here is distinguishable from those alleged in *Siegel*. Defendant is alleged to have had a long and deep relationship with Al Rajhi Bank, which Defendant chose to continue despite knowing of Al Rajhi Bank's ties to terrorism. In contrast, the plaintiffs in *Seigel* failed to allege any connection between the services provided to Al Rajhi Bank and terrorism, and HSBC ended its relationship with Al Rajhi Bank before the attacks at issue occurred due to concerns related to terrorist financing. *Id.* at 221, 224-25. The Complaint also alleges other direct relationships between Defendant and multiple fronts, funders and leaders of terrorist organizations, in further support of a finding of substantial assistance.

The fifth and sixth factors, "defendant's state of mind" and the "period of defendant's assistance" favor a finding of substantial assistance for similar reasons. "[T]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided" and also "may afford evidence of the defendant's state of mind." *Kaplan*, 999 F.3d at 857. The Complaint alleges that Defendant served as banker to terrorists like Jalaluddin Haqqani and Osama bin Laden since the 1990s. Regardless of whether Defendant's relationship with those individuals had ebbed by the time of the attacks at issue here, Defendant allegedly remained committed to facilitating terrorist financing, including of the groups those individuals founded and of those groups' allies and proxies. As discussed previously, the Complaint alleges that Defendant's assistance persisted throughout the period in which the attacks took place, despite the barriers created by international sanctions and the need for those groups to use shifting aliases and fronts.

The third factor is the only one that does not point toward liability. As a bank, Defendant was not physically present at the time of the attacks alleged. But that factor does not outweigh

17

the other five. *Kaplan*, 999 F.3d at 856 ("Plainly these factors are variables, and the absence of some need not be dispositive.").

### c. *Twitter*

Defendant argues that *Twitter* represents a change in the law that was not considered as part of the decisions in *King* due to that action's timing and procedural posture. Those arguments were considered and rejected in *King II*. *See* 2023 WL 8355359, at *2-3. That decision's posture as an order on reconsideration does not change the fact that the complaint in *King*, like the Complaint here, states a sufficient claim of secondary liability.

*Twitter* considered the standard for aiding and abetting liability under the ATA. *See* 598 U.S. at 491-507. The Court embraced the legal framework in the D.C. Circuit's decision, *Halberstam*, upon which the relevant Second Circuit precedent also rests. *Twitter*, 598 U.S. at 492-93; *see Kaplan*, 999 F.3d at 857; *King I*, 2022 WL 4537849, at *10. *Twitter* emphasized that courts should not apply *Halberstam* too rigidly but reaffirmed its "common-law framework as the primary guidepost for understanding the scope of § 2333(d)(2)." 598 U.S. at 493. The Court emphasized in *Twitter* that aiding and abetting liability must result from "conscious, voluntary, and culpable participation in another's wrongdoing," *id.*, which is consistent with the standard applied in *King I*, *King II* and here. The standard consistently applied is that "[t]he requirement that assistance be knowing is satisfied if the defendant knowingly -- and not innocently or inadvertently -- gave assistance." *King I*, 2022 WL 4537849, at *8; *King II*, 2023 WL 8355359, at *2.

Defendant argues that *Twitter* cautioned against conflating the "general awareness" and "knowing" requirements and raised the bar for what constitutes "knowing" to necessitate a defendant's conscious participation in, and association with, the criminal venture at issue. *See*

18

598 U.S. at 503. As described above, the analysis here does not conflate the "general awareness" and "knowing" requirements; the Complaint alleges assistance that is neither innocent nor inadvertent, goes beyond the standard for "general awareness," and is consistent with *Twitter*'s holding that the "knowing" requirement should "capture the defendants' state of mind with respect to their actions and the tortious conduct." *Id.* at 504.

Defendant's argument that *Twitter* requires a stronger nexus between the alleged assistance and criminal act than was previously required under Second Circuit case law is unpersuasive, as Defendant reads *Twitter* too narrowly. *Twitter* allows for "the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." *Id.* at 502. For example, if a "provider of routine services does so in an unusual way," those actions might well "constitute aiding and abetting a foreseeable terror attack." *Id.* That example is exactly what the Complaint alleges: that Defendant provided non-routine banking services to terrorists and their allies and that Defendant's management "subjectively intended to assist [Defendant's] terrorist customers in their effort to harm Americans." Defendant is squarely within the category of defendants that the Second Circuit has found secondarily liable due to their "special treatment of the [terrorist-affiliated] [c]ustomers." *Kaplan*, 999 F.3d at 866.

Defendant's argument that *Twitter* abrogates prior Second Circuit precedent is also unpersuasive. As described above, the holding in *Twitter* is not directly contrary to that precedent. A district court must follow Second Circuit precedent "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second

Circuit." *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015); *see also United States v. Dupree*, No. 16 Crim. 84, 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016) (determination of whether Second Circuit precedent has been overruled "should almost always be left to the Circuit to reconsider its prior decision"), *aff'd*, 767 F. App'x 181 (2d Cir. 2019). This Court will continue to adhere to the standard articulated in Second Circuit precedent such as *Kaplan*, which was not so "undermine[d]" by the holding in *Twitter* that its overruling is "inevitabl[e]." *See Diaz*, 122 F. Supp. 3d at 179.

### 2. Conspiracy Liability

The Complaint sufficiently alleges that Defendant participated in a conspiracy to commit the attacks at issue for the reasons already discussed. The Complaint alleges that Defendant took deliberate steps to help customers evade international sanction regimes -- actions that led to Defendant's ultimate expulsion from the U.S. Those allegations support the inference that Defendant agreed to further its customers' campaign of terrorism and shared a common purpose to do so. *See Halberstam*, 705 F.2d at 477 ("Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (noting that "conspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators"). The Complaint alleges that Defendant shared the al-Qaeda Terror Syndicate's goal of driving the U.S. military out of Afghanistan, an allegation that is made plausible by the many allegations of Defendant's support for al-Qaeda and the related organizations discussed above.

Defendant argues that *Freeman* requires more than allegations that a terrorist attack is the foreseeable result of the conspiracy, and instead requires that the attacks must advance the object

of the conspiracy.  *See* 57 F.4th at 80, 82.  In *Freeman*, the Second Circuit held that the plaintiffs

had failed to state a conspiracy claim under the ATA because they did not allege sufficiently that

the defendants, various financial institutions, had conspired with terrorist groups while working

with Iranian entities to evade U.S. sanctions.  *Id.* at 72.  The complaint did not allege "any fact

suggesting that the [defendants] conspired -- either directly or indirectly -- with the terrorist

perpetrators."  *Id.* at 79.  *Freeman* held that under the ATA, a complaint must allege "an

agreement between two or more persons to participate in an unlawful act," and that the alleged

coconspirators were "pursuing the same object."  *Id.*  Because the complaint failed to allege any

"common intent" between the defendant banks and the terrorist groups, dismissal was proper.

*Id.* at 80.

As described above, the Complaint here alleges that Defendant and the al-Qaeda Terror

Syndicate shared a common object: to force the U.S. military to leave Afghanistan.  The

customers that Defendant is alleged to have aided were not ostensibly legitimate organizations

caught up in a broad sanctions regime, but were allegedly well-known terrorists, fronts and

fundraisers.  The Complaints thus raise a reasonable inference that Defendant and the terrorist

organizations "shared [a] common intent" with respect to furtherance of the terrorist attacks at

issue.  *See id.*

**IV.    CONCLUSION**

It is hereby ordered that for the foregoing reasons, Defendant's motion to dismiss is

**GRANTED** in part and **DENIED** in part.  Defendant's motion to dismiss for lack of personal

jurisdiction is **DENIED** without prejudice to renewal.  Defendant's motion to dismiss is

**GRANTED** with respect to the primary liability claims and **DENIED** with respect to the

secondary liability claims.

The Clerk of Court is respectfully directed to close the motion at Docket No. 22.

Dated: February 25, 2025
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

22